Laramore, Judge,
delivered the opinion of the court:
This is an action for damages arising out of two contracts. Under a facilities contract, Ord-244, the Government agreed to furnish plaintiff certain facilities needed to perform a supply contract. The second contract, DA-04-495-OE.D-242, in the amount of $1,054,207.50, was for the rebuilding of 750 tank engines.
Plaintiff claims for recovery in four counts against the United States, the sum of $782,167.23 for alleged misrepresentation and breach of the two contracts above referred to. Under count one, claim is made for $101,739.16 of additional costs for extra work in the procurement of parts for the rebuilding of 750 GAA engines for M4A3 tanks, by reason of misrepresentation of the replacement parts required and procured on behalf of defendant.
Under count two, claim is made for $92,544.18 of increased costs by reason of the refusal and neglect of defendant’s authorized agents to comply with the contract provisions, and their interference with plaintiff’s efficient performance.
Under count three, claim is made for damages of $582,-883.89 against the defendant for withholding of reimbursement payments due plaintiff under its contract that required, *478 in part, the procurement of engine parts on behalf of the defendant.
Under count four, claim is made for $5,000 of increased costs to plaintiff by reason of the failure of the defendant to inspect facilities within a reasonable time, which had been procured and installed on behalf of the defendant, under a facilities contract, for use in rebuilding the 750 GAA engines, thereby delaying the reimbursement to plaintiff for its costs in acquiring and installing said facilities.[1]
The facts are voluminous and will be referred to here only to the extent necessary to each count of plaintiff’s claim. Each count will be dealt with separately. The facts respecting each contract are fully found by the commissioner and adopted by the court.
Under count one of plaintiff’s claim the charge is made that defendant misrepresented the amount of replacement parts required.
The facts show that the defendant, after considerable experience under a like contract with the firm of Bowen and McLaughlin, on October-31, 1951, sent Mr. Wesley M. San-didge, Chief of the Tank Automotive Branch, and Mr. Thomas E. Carpenter, a contract negotiator with the Los Angeles Ordnance District (LAOD), to plaintiff’s plant with the view of interesting plaintiff in rebuilding tank engines.
After certain negotiations plaintiff decided to bid on the rebuilding process. Prior to submitting its bid, the plaintiff requested a specimen engine that could be torn down and rebuilt for a practical test of the time and labor involved. The plaintiff was unable to obtain such an engine through LAOD, but did acquire one from another source for this purpose.
Following its study, plaintiff submitted a bid of $911.32 per engine. However, plaintiff’s representatives were advised *479 that this sum was too high, and plaintiff agreed to refigure it. Finally, a revised estimate was submitted which, after certain adjustment, was in the amount of $605.61 per engine. However, at no time did the plaintiff submit a bid estimate of $800 for parts in rebuilding the engine. Plaintiff was advised by Mr. Sandidge, Chief of the Tank Automotive Division, and Mr. Henry C. Genthe, a contract negotiator, that the cost would be about $800 for each engine, and the plaintiff relied on this estimate in figuring its fixed price bid for rebuilding. The award was then diverted from Bowen and McLaughlin to plaintiff, Snyder-Lynch Motors, Inc.
The facts further show that when the first contract was awarded to Bowen and McLaughlin for the same rebuilding early in 1951, there was very little information available for a determination of the cost or requirements of replacement parts. The estimate of $800 per engine proposed by the contract negotiator was merely for the purpose of an allotment of funds.
When the procurement order was received for the 750 engines, the defendant was in possession of information resulting from the experience of Bowen and McLaughlin that the cost of parts would substantially exceed the original estimate of $800. As a matter of fact, the cost of parts was approximately 145.5 percent over and above the estimated requirements. However, plaintiff was not advised of these facts and actually had no information regarding the required replacement parts, or the cost of the same at. the time its contract was negotiated.
Based on these and other facts, of record, the commissioner has found that:..' • . ' .
It is reasonable to conclude that the contracting of ficer, the contract negotiator and LAOD knew that $800 per engine was inadequate for the cost of replacement of parts prior to negotiating the plaintiff’s contract, but that the estimate of $800 per engine was used in plaintiff’s contract for the firm commitment of funds in the fiscal period, as had been done in the Bowen & McLaughlin contract in early 1951.
We think the Government was remiss in not making the information regarding the Bowen and McLaughlin experience available to plaintiff. Based on this conclusion, the *480 withholding of this information constituted a breach of the contract, and the plaintiff is entitled to recover the damages flowing therefrom. Ragonese, et al. v. United States, 128 Ct. Cl. 156; Bateson-Stolte, Inc. v. United States, 145 Ct. Cl. 387. Plaintiff’s unrecovered indirect costs of procuring the tank engine parts was $87,587.06. Plaintiff is entitled to damages in that amount on count one of its claim for the breach of the contract.
In count two plaintiff contends that defendant’s inspectors and agents interfered with plaintiff’s usual and customary operations and imposed certain requirements in violation of the contract provisions and specifications for the rebuilding of tank engines under contract Ord-242.
Plaintiff’s theory of this claim is that the defendant’s inspector, Jones, was responsible for all excess costs to June 30,1952. This is not sustained by the evidence. Conceding, however, that defendant did interfere with plaintiff’s operations, the record discloses and the commissioner has found that there is no proof of any excess costs that may be attributed to any improper action or failure on the part of defendant’s inspectors or officials. Under these circumstances, plaintiff cannot recover on this item of the claim for failure to prove damages, and count two will be dismissed.
Count three is for damages resulting from defendant’s alleged withholding of reimbursement payments due plaintiff under the contract. Plaintiff contends that the action of the defendant in withholding, from payments for reimbursable items, amounts to cover checks issued for reimbursement for direct charges, which checks had not cleared the bank within 30 days from the date of the checks, amounts to arbitrary and capricious action. Plaintiff then says that because of such action it was unable to continue its financing arrangements and that by reason thereof plaintiff was forced to and did sell its automobile agency together with equipment and inventory and that it thereby suffered a loss.
In respect to the above contention, the facts show that in reviewing certain costs, in September of 1952, preliminary to the price redetermination audit, the Army Audit Agency (AAA) found that plaintiff’s records were delinquent in many respects.
*481 By letter of September 18, 1952, the AAA reported to LAOD that during recent examinations of costs pertaining to voucher audits, and in review of certain costs preliminary to the price redetermination audit, it was found that plaintiff’s records were delinquent in many respects. It was pointed out that checks drawn in payment of invoices were posted before the liability for such invoices was recorded, which reflected an understatement of accounts payable. In a reconcilement of plaintiff’s bank statement for July 1952, it was determined that outstanding checks of $382,081.90 would result in a bank overdraft of $194,713.07. This matter had been discussed with plaintiff’s comptroller, who explained the procedure that many of the checks issued upon delivery of parts and verification of invoices were not actually outstanding, but were held by him for later release, amounting to approximately $179,389.70. But even considering the amounts for which payments were not yet due, the overdraft would be in excess of $15,000 upon payment of other checks issued.
The AAA recommended that the contracting officer instruct the contractor to bring its records into a current basis and maintain them in accordance with recognized practices, and that the contractor be instructed to provide weekly bank statements for use of the AAA auditor in verifying payments of checks issued.
The contracting officer was advised that the AAA would continue to make its audit determinations with the understanding that invoices supporting the reimbursement vouchers had been paid or were in the process of payment, but that in the event it was disclosed that vendors’ invoices were not paid promptly, recoupment would be made of costs previously approved. The contracting officer was advised that under this procedure the AAA auditor would permit a reasonable lapse of time for the clearance of checks and payments by the bank.
The action of the defendant appears to be in conformity with Title II-G of the contract, which provides:

Cost Records and Audit:

The Contractor shall at all times maintain adequate and accurate books and records of all transactions entered into by it pursuant to this TITLE II and such records will be in such manner and form as will ade *482 quately show the costs to the Contractor with respect to each such transaction. The Contracting Officer, or his duly authorized representative, shall, at all reasonable times, have the right to examine, or audit or otherwise satisfy himself as to the correctness of purchase orders, records, invoices, time records or other records upon which the Contractor’s claims for payment are based for replacement parts, materials and services reimbursable under this TITLE II. All such records shall be preserved by the Contractor for a period of three (3) years after the date of completion or termination of this contract. The Contractor agrees to maintain its books and records in a manner satisfactory to the Contracting Officer.
The obvious reason why the books and records should be open to inspection and kept in a manner satisfactory to the contracting officer is that the Government could not be expected to reimburse plaintiff until plaintiff had paid out something. Since the records were in a confused state, the Government was perfectly correct in demanding that plaintiff bring its records into a current status and maintain them in accordance with recognized practices as required by Title II-G of the contract. Consequently, any delay resulting from the inadequacy of the records was due to the fault and negligence of the plaintiff.
Plaintiff now contends that it relied upon Government Manual TM 14r-1000 and that 90 days represented a reasonable time for clearance of checks for payment under reimbursement vouchers instead of the 30-day period fixed by the Army Audit Agency.
Defendant contends that TM 14-1000 was only intended for use by the Audit Agency and was not something upon which plaintiff could rely.
However, assuming that TM 14-1000 does apply, section II thereof provides:
Section II. REIMBURSEMENT POLICIES
13. REIMBURSEMENT OE COSTS
a. It is intended that the contractor be reimbursed promptly and thus be enabled to regain his capital for use in further production. Prompt reimbursement also minimizes the need of the contractor for advances from the Government.
*483 b. For the purpose of reimbursement, costs normally will be considered as expended when — in the case of direct charges the cash has been paid out or the hank check drawn and placed in the mail and, in the case of overhead when the amounts of the liabilities for the items included therein have been definitely established or are based on reasonably accurate accruals. When adjustments in the amounts of the liabilities are developed in subsequent periods, the refunds or additional charges involved should be prorated on the same basis as the original charges if the net amount of the effect of the contract is material. [Italics supplied.]
c. As outlined in the sections dealing with overhead, monthly progress payments may be made for overhead on a tentative basis. These progress payments should be sufficiently less than the estimated overhead applicable to the contract to provide a suitable margin of safety. They do not constitute a reimbursement of costs but are advance payments against final overhead claims which will be presented by the contractor as a basis for the settlement of overhead. Care should be taken to avoid an excessive “hold back” of overhead during the year which would unnecessarily increase the contractor’s capital requirements.
d. The total current reimbursements to the prime contractor are to be controlled by the auditor to avoid exceeding the maximum total cost stated in the prime contract and amendments. If it becomes apparent to the auditor that the prime contract will so exceed, he will notify the contracting officer. In the case of a CPFF subcontract, the auditor at the subcontractor’s plant will notify his contracting officer and the auditor at the prime contractor’s plant in any instance in which it becomes apparent that an overrun will occur on the subcontract.
e. Contractors, engaged either solely, on CPFF work or on CPFF and other work, may be reimbursed for pay rolls on a gross basis in respect to deductions for social security taxes, victory tax, and all other pay roll deductions. However, in respect to deductions for bonds, the amounts deducted must be currently deposited in a special bank account to be used only for bond purposes.
f. A period of 90 days will be allowed for clearance of checks covering reimbursed direct charges as defined in paragraph 28 and deduction will then be made for any uncleared checks. Such deduction will not, however, include amounts covering taxes and bonds previously deducted from pay roll payments.
*484 In this case, plaintiff’s comptroller withheld checks totaling large amounts. Thus in these circumstances plaintiff was not eligible for reimbursement even under the 90-day provision contained in section II, paragraph 13f.
Defendant very strenuously argues that in any event plaintiff cannot recover for two additional reasons: (1) If the Government is responsible for delays in payment due to plaintiff, the measure of plaintiff’s damage is the sum withheld plus interest. Defendant then correctly states that the Government is not liable for interest unless called for in the contract or governing statute; (2) The damages claimed by plaintiff by reason of the “forced sale” of its automobile agency were not foreseeable at the time the parties entered the contract. However, in the light of our holding that the delays in respect to this claim were due to the fault of plaintiff, it is unnecessary to decide this point. Count three of plaintiff’s petition will be dismissed .
Count four is a claim for increased costs to plaintiff by reason of the failure of the defendant to inspect facilities within a reasonable time, which had been procured and installed on behalf of the defendant, under a facilities contract, for use in rebuilding the 750 GAA engines, thereby delaying the reimbursement to plaintiff for its costs in acquiring and installing such facilities.
In respect to the above claim, the record discloses that all the necessary facilities were procured by plaintiff. Most of the facilities acquired by plaintiff for the account of defendant were acquired and installed by the end of March 1952, and were substantially all acquired by the middle of June 1952. Final inspection and acceptance of the facilities and equipment was made in February 1953.
The commissioner has found that “had inspection and acceptance of all necessary tools and facilities been made promptly, plaintiff would have been reimbursed for substantially all of its facilities cost by July 15, 1952. The carrying charges thereafter for unpaid balances at the rate of five percent per annum to the dates of payment, * * *, would amount to $8,025.”
Plaintiff points out that rather than “carrying charges” the damages sought are for delay in inspection. Conse *485 quently, plaintiff now asks permission to amend its petition to indicate the nature of the damages sought as that for rental and plant protection expense rather than the carrying charges as heretofore alleged. We find no objection to this amendment by defendant and since no further proof is necessary or indicated, permission is granted and we will treat the petition as being so amended.
In this posture of the case, the facts show that there was considerable delay in the inspection. As a result thereof, plaintiff was required to maintain the facilities in a condition for defendant’s inspection and was unable to otherwise use it during this time after the contract had been performed and each engine delivered. The record reveals that plaintiff was required to pay rent on the premises where the idle facilities were installed at the rate of $2,920 per month, or a total of $11,680 from November 1 through February 28. However, $2,020 of those costs were paid, leaving a total sum of $9,659 which plaintiff paid as rent for this period.[2]
We can find no reason or excuse for the Government in not promptly inspecting the facilities. The facilities were no longer needed after October 31, 1952, when the rebuilding operations were completed. The Government had from July 15 to October 31 to make inspection, and we think this period of time was not only ample but generous. Since the final inspection was delayed until February 1953, we hold that plaintiff is entitled to recover the approximate amount paid as rent in order to maintain facilities pending inspection. Plaintiff is therefore entitled to recover $8,232.94 on count four of its petition.
In conclusion, since plaintiff is not entitled to recover on counts two and three, its petition as to those counts will be dismissed. Plaintiff is entitled to recover on counts one and four in the amounts set forth above, and judgment will be entered for plaintiff in the sum of $95,820.
It is so ordered.
Dureee, Judge; Madden, Judge; Whitaeer, Judge; and Jones, Chief Judge, concur.
*486 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation duly organized under the laws of the State of California, with its principal office at 1357 Vine Street, Hollywood, California.
2. The plaintiff claims for recovery in four counts against the United States, the sum of $782,167.23 for alleged misrepresentation and breach of two contracts hereinafter described. Under count one, claim is made for $101,739.16 of additional costs for extra work in the procurement of parts for the rebuilding of 750 GAA engines for M4A3 tanks, by reason of misrepresentation of the replacement parts required and procured on behalf of the defendant.
Under count two, claim is made for $92,544.18 of increased costs by reason of the refusal and neglect of the defendant’s authorized agents to comply with the contract provisions, and their interference with plaintiff’s efficient performance.
Under count three, claim is made for damages of $582,883.89 against the defendant for the withholding of reimbursement payments due plaintiff under its contract that required, in part, the procurement of engine parts on behalf of the defendant.
Under count four, claim is made for $5,000 of increased costs to plaintiff by reason of the failure of the defendant to inspect facilities within a reasonable time, which had been procured and installed on behalf of the defendant, under a facilities contract, for use in rebuilding the 750 GAA engines, thereby delaying the reimbursement to plaintiff for its costs in acquiring and installing such facilities.
3. On December 3, 1951, plaintiff entered into a contract No. DA-04-495-OKD-242, in the amount of $1,054,207.50, with the Los Angeles Ordnance District for the rebuilding of 750 tank engines.
This contract (sometimes referred to hereinafter as Ord-242) provided that the Government would deliver to the contractor unserviceable engines f .o.b. the contractor’s plant *487 at Burbank, California. The contractor was required to disassemble the engines and to rework and repair the parts to place them in a satisfactory and usable condition, if they were repairable by the usual and customary engine rebuilding methods and procedures, and to purchase for the account of the Government any replacement parts which the contracting officer authorized to be obtained.
Title I of this contract provided in part as follows:
I-A Description of Work: The Contractor shall rebuild and deliver to the Government, upon the terms and conditions hereinafter set forth, the following described unserviceable engines to be furnished by the Government to the Contractor in the quantity as hereinafter provided.
Item 1: 750 each, Engines, Ford, Model GAA, Federal Stock No. G104-5414700., for M4A.3 Tank, to be completely rebuilt and reconditioned by the Contractor in accordance with the requirements of Ordnance Corps Engineering, Change Order No. 19094, dated 4 November 1948, as amended by Ordnance Corps Engineering, Change Orders No. 19094 — 1 through and including No. 190947-44, insofar as the Engineering Change Orders specified above are applicable to such engines.
I-B Price: The price, exclusive of any direct reimbursement to the Contractor for purchase of parts, and for other costs, as hereinafter provided, for rebuilding engines as above described, shall be:
§605.61 each, f.o.b. common carrier, Contractor’s Plant, Burbank, California.
The price stated above shall include the cost to the Contractor of all labor, material, supplies, tools, equipment and facilities required for rebuilding and (delivering the above described engines, except as otherwise provided in this contract.
Total Contract Price for 750 Engines at $605.61
each_ $454,207.50
Pins estimated amount to be paid to Contractor on account of direct reimbursement as hereinafter provided (based upon reimbursement on 750 engines at estimated reimbursement of $8.00 each_ 600,000.00
Estimated Total Amount of this Contract_ 1, 054,207. 50
I-C — Applicable Drawings and Specifications: The aforementioned Ordnance Corps Engineering Change Order No. 19094, and amending Ordnance Corps Engineering Change Order Nos. 19094-1 to 19094 — 44, inclu *488 sive, are hereby incorporated in and made a part of, this contract. The drawings, specifications, manuals, and the like, which are referred to in such Engineering Change Orders, and which are applicable to engines, shall be complied with by the Contractor in rebuilding engines hereunder. All such applicable drawings, specifications, manuals and the like, so referred to, shall also be deemed to be incorporated in, and made a part of, this contract by reference. The Government, upon application to it by the Contractor, shall furnish the Contractor with such Engineering Change Orders, drawings, specifications, manuals and the like as are necessary and required by the Contractor for performance under this contract.
I-E Government's Obligation to Supply Replacement Parts:
(1) The Contractor shall utilize, to the extent possible, the parts of the unserviceable engines being rebuilt, and to that end will repair and rework, insofar as is possible by usual and customary engine rebuilding methods and procedures, all such parts as are repairable, and thereby place such parts in a satisfactory and useable condition. If any parts of unserviceable engines are missing, or are damaged or worn to such an extent as to be incapable of repair by usual and customary engine rebuilding methods and procedures, which shall be determined by the Contracting Officer, then, in such case, such parts shall be replaced by parts to be supplied by the Government as Government-furnished property, either directly from Government sources, or indirectly, by authorizing the Contractor to purchase such parts for the Government’s account, in which case the Contractor shall be reimbursed at cost for the parts so purchased, as hereinafter provided.
A (2) All parts furnished by the Government shall be delivered to the Contractor f.o.b. common carrier, Contractor’s Plant, Burbank, California. If shipment is by rail, the last carrier will be specified as the Southern Pacific Co., unless the Contractor shall hereafter advise otherwise.
(3) All such parts shall be accepted “as is” by the Contractor, and, if repairable by usual and customary engine rebuilding methods and procedures, shall be repaired, reworked and placed in a satisfactory and useable condition by the Contractor in the same manner as is required in processing the parts of unserviceable engines, as above provided. There shall be no extra cost to the Government for such processing of parts delivered *489 to the Contractor by the Government, all such costs being included in the contract price herein provided for rebuilding the unserviceable engines.
(4) It shall be the responsibility of the Contractor to estimate its needs for replacement parts sufficiently in advance of its production requirements to avoid any delay in delivery of rebuilt engines under this contract. To this end the Contractor shall requisition from the Government the replacement parts needed by it in the performance of this contract, and the Government, if such requisition is approved by the Contracting Officer, shall deliver to the Contractor as promptly as possible such of the parts as are available. In the event such parts are not available from the Government, or in the event the Government is unable to deliver such parts to the Contractor in sufficient time to meet the Contractor’s production requirements, or in the event the Government deems it more advantageous to purchase such replacement parts from commercial sources, then in any of such events, the Contracting Officer shall authorize and approve the purchase of such replacement parts by the Contractor on the most advantageous terms from commercial sources and the Contractor shall be reimbursed for the actual cost of the parts purchased, as hereinafter provided. The Contractor agrees to purchase for the account of the Government any required replacement parts which the Contracting Officer has authorized it to obtain, and shall, in good faith, purchase such parts at the best price and upon the most advantageous terms possible.
I-F Utilization of Contractor's Plant by the Government:
(1) Until completion or other termination of this contract, the Contracting Officer may provide such “on the job” personnel at the Contractor’s Plant as he deems necessary to protect the Government’s rights and interests under this contract, and to enable prompt “on the job” decisions and approvals with respect to Contractor’s purchase orders and invoices, inspection and acceptance of rebuilt engines, disposal of salvage and scrap, shipping instructions, and such other matters as will permit the expeditious and efficient performance of this contract.
I-H Inspection and Acceptance at Contractor's Plant, Burbank, California, by the Los Angeles Ordnance District. Final inspection and acceptance of rebuilt engines shall be effected by the Government’s inspectors promptly with respect to all such engines as *490 are ready for delivery, and acceptance of such, engines by the Government will not be delayed because of the Government’s failure to give shipping instructions promptly or because the Government desires that any such engines be held in temporary storage pending such shipping instructions.
The contract provided for the delivery of the rebuilt engines f.o.b. plaintiff’s plant at Burbank, California at 50 during April 1952; 125 in May; 175 in June; and 200 each in July and August 1952.
4. Contract Ord. 242 was a dual purpose agreement. Under title I the contractor was required to rebuild 750 tank engines at a fixed price. Title II of this contract provided for the reimbursement to the contractor for its cost of the additional parts and supplies procured by the contractor for the account of the Government, and the cost of repairs or replacement of shipping containers, as necessary and required to rebuild the engines provided under title I.
Title II of this contract provided in part:
II-A Scope of Reimbursab le G osts:
With the exception of such costs and expenditures by the Contractor as are defined in this Title II as reimbursable costs, all costs of rebuilding engines and other performance under this contract shall be included in the unit price of the rebuilt engines to be delivered hereunder, including, but not limited to, the cost of labor; the cost of all materials and supplies used in rebuilding, but excluding such materials and supplies when used by the Contractor in the manufacture of parts or the extraordinary reclamation of parts, as provided in this Title II; the cost of tools, equipment and facilities of the Contractor and not furnished by the Government; the cost of packing and marking, except as to such repair of containers as is hereafter defined in this Title II as a reimbursable cost; the cost of handling, temporary storage and loading on board common carrier; and all other costs of a similar nature which are not expressly defined in this Title II as a reimbursable cost.
II-B Replacement Parts:
(1) For the purposes of this contract, a replacement part for engines being rebuilt hereunder shall be all parts, accessories, components and attachments of such engines as are necessary and required to rebuild such engines in accordance with the requirements of this contract, and shall include parts common, .or • otherwise, *491 such as nuts, bolts, wasters, gaskets, miscellaneous 'hardware and the like, which are actually installed in or attached to the completed engine when it is in operation, but shall not include items of expendable supply such as masking and other tapes, shellac or the like attached to such engine at the time of delivery to protect in shipment, close open vents in engine or the like; nor shall be included any items of supply such as gas and oil or supplies or materials used in testing such engine prior to delivery thereof.
(2) When authorized, in writing, by the Contracting Officer or by his duly authorized representative, the Contractor shall procure from commercial or other sources such replacement parts, accessories, components and attachments (hereinafter called replacement parts) of unserviceable engines as are necessary and required in the rebuilding thereof. The Contractor in good faith shall procure such parts from reliable suppliers, at the best prices and upon the most advantageous terms possible. Upon delivery thereof to the Contractor, the Contractor shall be reimbursed for such replacement parts as follows:
(i) The actual net invoice purchase price of the Items so procured; and
(ii) The cost of transportation by common carrier, if any, of such items to Contractor’s Plant, if the price of the items procured does not include such transportation.
II-D Supplies:
(1) The Contractor shall be reimbursed for the cost of all gasoline, oil, and degreasing and cleaning compounds and solvents used in the testing and rebuilding of such engines in accordance with the applicable provisions of this contract, as follows:
(i) The actual net invoice purchase price of the items so procured and used; and
(ii) The cost of transportation by common carrier, if any, of such items to Contractor’s Plant, if the price of the items procured does not include such transportation.
II-E Repair of Shipping Containers: * * * Upon completion of the repair of each lot of damaged containers, the contractor shall be reimbursed for the cost of such repairs as follows:
(i) The actual net price of all material required in the manufacture of such items;
(ii) The cost of transportation by common carrier, if any, of material required; or of the shipping container if same is repaired in a plant of the contractor other *492 than Contractor’s plant at Burbank, California, unless the price of such material purchased included such transportation;
(iii) The cost to the Contractor of all direct labor required in the repair of such shipping containers.
II-F Regulations to Govern:
The reimbursement due the Contractor for its costs incurred in performance of this Title II shall be computed in accordance with the cost principles set forth in Part 2 of Section XV of the Armed Services Procurement Regulations insofar as such cost principles are not inconsistent with the provisions herein set forth in this Title II. The aforementioned Part 2 of Section XV of the Armed Services Procurement Regulations are hereby incorporated in and made a part of this contract by reference.[1]
II-H Payment of Reimbursable Oosts:
The Contracting Officer, or his duly authorized representative, shall promptly verify for correctness, and, if correct, pass for payment properly certified invoices or vouchers rendered by the Contractor for costs incurred by it, under this Title II, and, thereupon, such invoice shall be paid by the Government as provided in General Provision 1 hereof, entitled, “Payments”. The Contractor shall submit such invoices or vouchers in such manner, form and detail as the Contracting Officer may reasonably require.
5. The General Provisions of Contract Ord-242 are contained under Title V and provide in part:
V-A General Provisions
The General Provisions hereinafter set forth are included in and made a part of this contract. To the extent of any inconsistency between either Titles I, II, III, IV or V (General Provisions) and any specifica *493 tions or other provisions which are made a part of this contract by reference, or otherwise, then, in any of such events, the provisions of Titles I, II, III, IY or Y, as the case may be, shall control. To the extent of any inconsistency between either Titles I, II, III, or IV, and Title V' (General Provisions), then, in any of such events, the provisions of Titles I, II, III or IY, as the case may be, shall control.
2. Changes
The Contracting; Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time/prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes”. However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
5. Inspection
(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.
(b) In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them (with or without instructions as to their disposition) *494 or to require their correction. Supplies or lots of supplies which have been rejected or required to be corrected shall be removed or corrected in place, as requested by the Contracting Officer, by and at the expense of the Contractor promptly after notice, and shall not again be tendered for acceptance unless the former tender and either the rejection or requirement of correction is disclosed. If the Contractor fails promptly to remove such supplies or lots of supplies, when requested by the Contracting Officer, and to proceed promptly with the replacement or correction thereof, the Government either (i) may by contract or otherwise .replace or correct such supplies and charge to the Contract the cost occasioned the Government thereby, or (ii) may terminate this contract for default as provided in the clause of this contract entitled “Default.” Unless the Contractor elects to correct or replace the supplies which the Government has a right to reject and is able to make such correction or replacement within the required delivery schedule, the the Contracting Officer may require the delivery of such supplies at a reduction in price which is equitable under the circumstances. Failure to agree to such reduction of price shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.”
(c) If any inspection or test is made by the Government on the premises of the Contractor or a subcontractor, the Contractor without additional charge shall provide all reasonable facilities and assistance for the safety and convenience of the Government inspectors in the performance of their duties. If Government inspection or test is made at a point other than the premises of the Contractor or subcontractor, it shall be at the expense of the Government: Provided, That in case of rejection the Government shall not be liable for any reduction in value of samples used in connection with such inspection or test. All inspections and tests by the Government shall be performed in such manner as not to unduly delay the work. The Government reserves the right to charge to the Contractor any additional cost of Government inspection and test when supplies are not ready at the time such inspection and test is requested by the Contractor. Final acceptance or rejection of the supplies shall be made as promptly as practicable after delivery, except as otherwise provided in this contract; but failure to inspect and accept or reject supplies shall neither re *495 lieve the Contractor from responsibility for such supplies as are not in accordance with the contract requirements nor impose liability on the Government therefor.
(d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects _ or other failures to meet the contract requirements which may be discovered prior to final acceptance. Except as otherwise provided in this contract, final acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.
(e) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the supplies hereunder. Kecords of all inspection work by the Contractor shall be kept complete and available to the Government during the performance of this contract and for such longer period as may be specified elsewhere in this contract.
7. Payments
The Contractor shall be paid, upon the submission of properly certified invoices or vouchers, the prices stipulated herein for supplies delivered and accepted or services rendered and accepted, less deductions, if any, as herein provided. Unless otherwise specified, payment will be made on partial deliveries accepted by the Government when the amount due on such deliveries so warrants; or, when requested by the Contractor, payment for accepted partial deliveries shall be made whenever such payment would equal or exceed either $1,000 or 50 percent of the total amount of this contract.
12. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with 'any appeal proceeding under this clause, the Contractor shall be *496 afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
30-A Records of Government-Owned Property.— Records of Government-owned property shall be maintained in accordance with Appendix “B”, entitled, “Manual for Control of Government Property in Possession of Contractors”, of the Armed Services Procurement Regulation, Section XIII; which Appendix “B” is hereby incorporated in and made a part of this contract by reference, and it shall be complied with in all respects by the parties hereto. The Property Officer, Los An-geles Ordnance District, is designated as the Property Administrator to maintain the necessary property records in connection with this contract, and to perform the duties as required by the aforementioned “Manual for Control of Government Property hi Possession of Contractors”.
33 Price Redetermination. — (a) The prices stated herein may be increased or decreased in accordance with this clause. In no event shall the revised price, exclusive of the aggregate of sums paid or payable to the Contractor as direct reimbursable costs, as elsewhere in this contract provided, exceed $500,000.00.
(bl Times for negotiation
(1) Upon completion of delivery of thirty percent unless the Contracting Officer shall agree in writing to a later date, but in no event later than upon the completion of forty percent, of the rebuilt engines to be supplied under this contract, the parties shall negotiate to revise the prices of all items theretofore and thereafter to be delivered. Within not to exceed thirty (30) days after the completion of delivery referred to above, the Contractor shall furnish to the Contracting Officer the statements and data referred to in paragraph (c) of this clause. At any time and from time to time after the completion of delivery referred to above, subject to the limitations specified in this clause, either the Government or the Contractor may deliver to the other a written demand that the parties negotiate to adjust the prices under this contract. No demand shall be made prior to 90 days after completion of delivery referred to above, and thereafter neither party shall make a demand having an effective date within 90 days of the effective date of any prior demand. Each demand shall specify a date (identical with or subsequent to the date *497 of the delivery of the demand) as of which the revised prices shall be effective as to the deliveries made thereon and thereafter. This date is hereinafter referred to as “the effective date of the price redetermination.” For the purposes of the first negotiation contemplated by this paragraph, the date of execution of this contract shall be deemed to be the effective date of the price redeter-mination. Any demand under this clause, if made by the Contractor, shall state briefly the ground or grounds therefor and shall be accompanied by the statements and data referred to in paragraph (c) of this clause. If the demand is made by the Government, such statements and data will be furnished by the Contractor within 30 days of the delivery of the demand.
(2) In the event all remaining work under this contract, as it may from time to time be amended, shall be terminated pursuant to the clause of this contract entitled “Termination for Convenience of the Government”, no demand shall then or thereafter be made and any demand the effective date of which is less than 30 days before the effective date of such termination shall be void and of no effect.
(c) Submission of data. — At the time or each of the times specified or provided for in paragraph (b) of this clause the Contractor shall submit (i) a new estimate and breakdown of the unit cost and the proposed prices of the items remaining under this contract after the effective date of the price redetermination, itemized so far as is practicable m the manner prescribed by WD Form 105; (ii) an explanation of the differences between the original (or last preceding) estimate and the new estimate; (iii) such relevant shop and engineering data, cost records, overhead absorption reports and accounting statements as may be of assistance in determining the accuracy and reliability of the new estimate; (iv) a statement of experienced costs of production hereunder to the extent that they are available at the time or times of the negotiation of the revision of prices hereunder; and (v) any other relevant data usually furnished in the case of negotiation of prices under a new contract. The Government may make such examination of the Contractor’s accounts, records and books as the Contracting Officer may require and may make such audit thereof as the Contracting Officer may deem necessary.
id) Negotiations.
(1) Upon the filing of the statements and data required by paragraph (c) of this clause, the Contractor and the Contracting Officer will negotiate promptly in *498 good faith, to agree upon prices for items to be delivered on and after the effective date of the price redetermination. Negotiations for price redetermination under this clause shall be conducted on the same basis, employing the same types of data (including, without limitations, comparative prices, comparative costs, and trends thereof) as in the negotiation of prices under a new contract.
(2) After each negotiation the agreement reached will be evidenced by a supplemental agreement stating the redetermined prices to be effective with respect to deliveries on and after the effective date of the price redetermination (or such other later date as the parties may fix in such supplemental agreement).
(e) Disagreements. If within 30 days after the date on which the statements and data are required pursuant to paragraph (b) of this clause to be filed (or such further period as may be fixed by written agreement) the Contracting Officer and the Contractor fail to agree to redetermined prices (which term, for the purpose of this clause, shall include direct costs, indirect costs and profit), the failure to agree shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes,” and the prices so fixed shall remain in effect for the balance of the contract notwithstanding any other provision of this clause.
(f) Payments. Until new prices shall become effective in accordance with this clause, the prices in force at the effective date of the price redetermination shall be paid upon all deliveries, subject to appropriate later redetermination made pursuant to paragraph (d) or (e) or (g) (2) (B) of this clause.
The general provisions of contract Ord-242 also contains a provision for the termination for the convenience of the Government, the price redetermination in the event of termination, and a provision for the assignment of claims under this contract by the contractor.
6. Contract Ord-242 was increased to $2,054,342.99 by changes and supplementary agreements, of which $555,510.15 became payable under title I for rebuilding the 150 engines and $1,498,832.84 consistuted reimbursement of costs under title II of this contract. Eleven changes and supplemental agreements were issued and constituted part of contract Ord-242. The contract price was changed under the following supplemental agreements:
*499 (a) On September 5, 1952, supplemental agreement No. 4 was issued providing for an estimated increase of reim-bursables of $932,116.63 under title II of the contract from $600,000 to an estimated $1,532,116.63.
(b) On November 21,1952, supplemental agreement No. 6 was issued providing for the reimbursement to plaintiff under title II for the packing, marking and shipping of Government furnished property (GFP) constituting engine parts in excess of requirements. It provided for the reimbursement of plaintiff’s actual cost of materials and labor plus an allowance of 180 percent of direct labor as plant overhead and general and administrative expenses in the performance of this work after November 1, 1952, but not to exceed $25,000, and without any increase in the total estimate for reimbursables under the contract. It was later determined that the cost of packing, marking and shipping of the excess GFP would exceed the maximum allowance of $25,000, and by supplemental agreement No. 8, January 10, 1953, the maximum was increased to $25,900.
(c) On December 8, 1952, supplemental agreement No. 7 was issued providing for an increase of $8 per engine from $605.61 to $613.61, thereby increasing the fixed price under title I to $460,207.50, by reason of an increase for the dyna-mometer run-in tests of the engines from about 4% hours to 5 hours 40 minutes, in conformance with the Army Technical Bulletin TB-OKD-215, dated April 20, 1951, specified in change order No. 2 dated April 1,1952.
This supplemental agreement also provided for a deduction from the final payment of $718.10 because of additional equipment furnished by the Government under schedules B-l and B-2 to supplemental agreements Nos. 2 and 3 of a separate facilities contract hereinafter described, for plaintiff’s use in the performance of contract Ord-242.
Supplement No. 7 also increased the maximum amount of $500,000 in article 33, Price Redetermination, to a maximum of $506,228.25.
(d) On July 15,1953, by supplemental agreement No. 10, contract Ord-242 was increased by $46,020.75 under Article 33, Price Redetermination, as amended by supplement *500 No. 7, to tbe maximum of $506,228.25, for rebuilding engines under title I.
(e) By supplement No. 11, issued Marcli 22, 1955, the maximum amount stipulated for redetermination of price under article S3, was increased from $506,228.25 to $556,228.25, and the plaintiff was awarded an additional $50,000 as an equitable adjustment of the contract in settlement of an unnumbered change order dated April 5, 1952, copy of which was attached to this supplemental agreement, which reads:
Engines being rebuilt under subject contract are acceptable for Field Service with .020 undersize crankshafts. All engines must be equipped with new style oil pan and pump.
Contract Ord-242 was increased by supplement No. 11 in the net amount of only $16,116.21. Paragraph 4 states in part:
The parties hereto recognize that the $16,116.21 is a net figure resulting from a $50,000 increase in the contract amount for the purpose of settling an unnumbered contract change order and a decrease of $33,888.79 in the estimated amount of direct cost reimbursement.
Thus contract Ord-242, as amended in the foregoing supplemental agreements, provided for payments under title I of $556,228.25 less $718.10 for facilities furnished by the Government, or the net sum of $555,510.15, and for the payments of $1,498,832.84 for reimbursables under title II, including $25,900 for the packing, marking and shipping of parts in excess of contract requirements specified under supplement No. 8.
7. All deliveries of rebuilt engines under title I of contract Ord-242 were completed by the end of October 1952. There were no vouchers, nor any tabulation of payments made under title I, for the fixed price portion of this contract. However, it is reasonable to conclude that such payments were made within 30 days after the completion of deliveries at the contract price in effect. A summary of all payments for reimbursable costs was filed as defendant’s exhibit 32. A summary of payments under contract Ord-242 follows:

*501

8. The plaintiff was paid $1,498,832.84 for reimbursable costs under title II of contract Ord-242. By deducting the cost of $25,900 under supplemental agreements 6 and 8 for packing, marking and shipping parts in excess of requirements, there remain reimbursable costs of $1,472,932.84 for the procurement of new parts, gasoline, oil and cleaning compounds, and the cost of repairing shipping containers. Thus the average amount reimbursed was $1,963.91 for each engine rebuilt, or 2.45 times the contract estimate for reim-bursables of $800 for each engine.
Following the completion of rebuilding the 750 engines the plaintiff returned to the Government approximately $478,821.47 of unused parts and supplies. However, the plaintiff received 830 unserviceable engines that were torn down and “cannibalized” for usable parts in the 750 rebuilt engines. New parts were classified as condition 1 for use in rebuilding engines whereas the old parts from the unserviceable engines or otherwise supplied by the Government were classified as condition 7, or scrapped when determined *502 to be unserviceable. Condition 7 parts required reconditioning or cleaning in order to place them in condition 1 for use. The pricing of inventories of parts in excess of requirements was the same for condition 7 parts as for condition 1 parts, so that it is not possible to determine to what extent the inventory of parts represented the procurement of new parts for which reimbursements were made.
All purchase orders for parts issued 'by the plaintiff were first approved by the contracting officer’s representative. Early purchases were made on the basis of a table of mortality replacements experienced by Bowen and McLaughlin, in rebuilding 1280 engines up to September 30,1951.
9. The bid proposal contained a provision for bidding on the “Estimated cost of additional facilities to be manufactured or acquired by contractor for account of Government or Government agency”, for which plaintiff submitted a bid of $65,750. However, a separate contract was negotiated for additional facilities required for the performance of the engine rebuilding contract, designated as No. DA-04-495ORD-244, dated December 4, 1951, hereinafter referred to as Ord-244. The estimated cost of such facilities was $64,100, which was specifically set forth in a list of equipment and special tooling in Schedule “A”, attached to this contract.
Title I of contract Ord-244 provided for the acquisition of facilities and title II specified allowable costs and reimbursements to the contractor. Titile I provided in part:
Article 1-A. Pvoawemmt of Facilities
2. The Contractor may, with the written approval of the Contracting Officer, substitute facilities similar to those in Schedule “A” or additional facilities thereto from time to time as required during the course of the work; in which event Schedule “A” wifi be modified accordingly. Copies of all approved revisions or changes of said Schedule “A” shall be furnished the Contracting Officer so that, at all times, Ms copy of Schedule “A” will be current and include all approved modifications. A final revised Schedule “A” containing all modifications will be prepared by the Contractor upon completion of the work under Title I and upon final approval by the Contracting Officer will be appended to each of the signed copies of this contract. The final re *503 vised Schedule “A” shall be divided into “severable” and “non-severable” facilities.
Article 1-B. Estimates
It is estimated that the total cost of the Contractor’s performance under Title I of this contract will be approximately Sixty-four Thousand One Hundred and No/100ths dollars ($64,100.00) exclusive of the cost of any Government-furnished property. It is expressly understood, however, that neither the Government nor the Contractor guarantees the correctness of these estimates. The estimated costs set forth above are based upon an estimate approved and agreed to by the Government and the Contractor, a copy of which is on file in the office of the Contracting Officer.
Title II provided for reimbursement to the contractor for its costs of facilities acquired, as approved or ratified by the contracting officer, in accordance with Part 2, Section XV of the Armed Services Procurement Regulations, as provided in title II of contract Ord-242 (finding 4). Contract Ord-244 provided for reimbursements “in accordance with said principles”, as follows:
(a) The net invoice price plus actual transportation cost of facilities procured from outside sources, (b) the net invoice price, cost of transportation, all direct labor and allo-cable overhead and general and administrative expenses for facilities manufactured, other than standard or commercial items, and (c) the lowest price currently charged for standard or commercial items manufactured; (d) costs for the installation of facilities in like manner as under (b) above, except (e) the net invoice price to the contractor when such installations were performed by an outside party under a subcontract; and (f) costs for necessary plant rearrangement, rehabilitation and incidental construction as under (b) above, when performed by the contractor with its own employees, or the net invoice price for such work, if performed by others.
Article II-E, payments, provided in part:
2. Final Payment. Upon completion of the work pursuant to Title I and final acceptance thereof in writing by the Contracting Officer, the Government shall pay to the Contractor the imp aid balance of the cost of the work determined under Title II hereof, less any sum that may be necessary to settle any unsettled claims for *504 labor or materials, or any claim in connection, with, this Contract which the Government may have against the Contractor. The Contracting Officer shall accept or reject the completed work with reasonable promptness. Prior to final payment and as a condition thereto, the Contractor shall iumish the Government with a release of all claims against the Government arising under and by virtue of this Contract other than such claims, if any, as may be specifically excepted by the Contractor from the operation of the release in stated amount to be set forth therein.
The contract provided that the Government would furnish equipment listed in Schedule “B” attached thereto, for which “none” was listed. It also reserved to the Government the right to furnish any additional equipment, or to provide any type of equipment listed in Schedule “A” that was in a satisfactory operating condition, in which event such equipment would be transferred from Schedule “A” to Schedule “B” of this contract.
10. Contract Ord-244 was revised by the following supplemental agreements:
(a) By supplemental agreement No. 1, dated April 4,1952, Schedule “A” of facilities and special tools was revised and increased by $30,703.75, and Schedule A-l was substituted therefor in the estimated amount of $94,803.75.
(b) On August 20, 1952, supplemental agreement No. 2 revised schedule A-l, and schedule A-2 was substituted therefor in the reduced amount of $94,461.75, and schedule B-l listed some 23 items of equipment and 10 groups of special tools which were furnished by the Government, without cost to the contractor.
(c) On December 8, 1952, supplemental agreement No. 3 revised schedule B-2, with four additional items of equipment furnished by the Government, and schedule A-3 revised, was substituted in lieu of schedule A-2, without any change in the estimated costs for reimbursements.
(d) By supplemental agreement No. 4, dated January 27, 1953, the plaintiff undertook to dismantle, package and crate all equipment and tools acquired for the Government at its actual cost of materials, labor and 96.72 percent of direct labor as an allowance for overhead and general administrative expense, not to exceed an estimated $6,300.
*505 (e) On April 2, 1953, schedule A-4 was substituted for A-3 by supplemental agreement No. 5, increasing the estimated sum for reimbursement by $68,809.44, as follows:
Equipment and facilities_ $139,222. 88
Factory burden_ $19,138.01
G- & A overhead_ 6, 394. 62
- 25, 532.68
Actual cost of dismantling, crating and processing of facilities under supplemental agreement No 4_ 4, 815. 68
Total estimated costs_ 169, 571.19
(f) On February 21,1955, contract Ord-244 was increased by the net sum of $10,751.03 under supplemental agreement No. 6, to the estimated sum of $180,322.22, by amendments to schedule A-4 as follows:
Additional cost of special tools_ $4,960.12
Cost of plant rearrangement, rehabilitation and incidental construction_ 6, 916. 76
- $11,876.88
Less a reduction of other facilities in schedule A-4_ — 1,125.85
Net increase in estimated reimbursables_ 10, 751. 03
11. The estimated costs for facilities under contract Ord-244, as amended by supplemental agreements reported in the preceding finding were reimbursed and paid to the plaintiff in amounts set out in the following tabulation:

1952

Amounts

April_ $16,383.91
May_ 15, 561.27
June _ 13,711. 61
September 4,901.68
$50, 558.47

195S

April - 4,777.27
May_ 9,351. 06
July-26,452.34
August _ 69,269.18
September _ 810.44
October_ 1,905. 51
112, 565. 80

1954

April 2,171. 32

*506
1955

Amounts

January _ 1, 397.32
February _ 1, 752.43
March_ 11,876.88 15,026.63
Total reimbursements as estimated_ 180, 322. 22

Count I

12. Prior to the award of contract Qrd-242 to the plaintiff herein, the Los Angeles Ordnance District (sometimes referred to herein as LAOD) had contracted with only one firm for rebuilding the Ford tank engine, which was Bowen & McLaughlin of Phoenix, Arizona.
On January 9, 1951, Bowen & McLaughlin was awarded a letter order for rebuilding 750 GAA Ford tank engines M4A3 without any specified price, but with the provision that a contract would be negotiated within 120 days. By supplemental agreement No. 1, dated May 9, 1951, the agreement was formalized as contract DA-04-495-OBD-36, increasing the quantity to 3,115 engines at a unit price of $727.48, and direct reimbursement for the cost of replacement parts estimated at $800 for each engine. The estimate for parts at $800 per engine was an indeterminate estimate since neither the LAOD nor Bowen & McLaughlin had any substantial information of what the replacement requirements would be.
The Bowen & McLaughlin contract was similar to plaintiff’s contract Ord-242, with the price redetermination clause and provisions for the reimbursement cost of parts, repair and replacements of shipping containers, but not for gasoline, oil and cleaning solvents. It was revised and increased from time to time by supplemental agreements as follows:
Supplement No. 2 issued October 1, 1951, increased the quantity by 505 engines at $727.48, with the reimbursement for parts estimated at $800 each.
Supplement No. 5 dated December 15,1951, increased the quantity by 100 engines at a unit price of $699.22 with reimbursement for parts estimated at $800 each.
Supplement No. 6, dated January 8, 1952, increased the quantity by 1047 engines at a unit price of $669.46, with reimbursement for parts, which was increased by $1,292,012, or an average of about $1,234 each.
*507 By supplement No. 7, dated Marcli 10, 1952, the estimate for reimbursements was increased by $1,448,000 to the aggregate sum of $5,716,012, or an average unit cost for the 4,647 engines of about $1,199 each.
The first engine was completed under the Bowen & McLaughlin contract April 19, 1951, and the entire contract was completed about the end of November 1952.
On April 28, 1953, supplemental agreement No. 19 was issued setting forth the final redetermination of price at $835 each for the first 1,209 engines delivered; $660 each for the next 791 engines; $625 each for the next 1,174 engines, and $743.70 for the final 1,593 engines delivered. The total contract price was adjusted to $9,102,352.05, including $5,756,481 reimbursement for parts, at an average cost of $1,207.57, and $55,131.95 for special packing for export, top assemblies and shipping containers. Bowen & McLaughlin was paid $45,394 for repair or replacement of 500 shipping containers, or approximately .8 percent of its reimbursement for purchases of replacement parts.
There is no satisfactory evidence to what extent Bowen & McLaughlin was furnished replacement parts by the Government, either from Government stock or 'by way of additional engines which were cannibalized for usable parts on engines furnished for rebuilding.
13. On October 20, 1951, Bowen & McLaughlin submitted to LAOD a detailed analysis of its costs to September 30, 1951, covering the first 1,209 engines completed, with its proposal for price redetermination. After the elimination of $121,374.10 of non-recurring plant expense entirely and adjustments for inventory of work in process September 30, 1951, its per unit cost experience was reported as follows:

*508 14. On October 25, 1951, Bowen & McLaughlin submitted a tabulation of replacement parts required in processing 1,280 engines up to September 30, 1951, sometimes referred to as its mortality table. This mortality table listed approximately 1,200 parts used as replacements in rebuilding the engines, with an average cost of $970.83 plus freight on parts purchased averaging about $21.92 per unit or a total cost of $992.75 per engine.
Bowen & McLaughlin pointed out that parts supplied through Ordnance channels were priced from the Ordnance price guide, and parts secured on the current market carried the quoted price. The approximate current price exceeded the Government price guide by 30 percent for crankshafts, 40 percent for sleeves, and 55 percent for main upper and lower bearings. It was further reported that in processing approximately 400 of the first engines the better motors were used with low mortality rate due to non-availability of parts; also that the requirements for rebuilding the remaining engines to meet the specifications of Standard engines would require resleeving, standard shafts and new oil pans, thus increasing the ratio of expensive parts. The letter of transmittal stated in part:
The original estimate of $800 per engine (which was set up for arriving at a sum for allotment of funds) was discussed by the contracting parties and was outlined as an indeterminate figure. Again we are to the point where an estimate must be made in order to assure funds for future procurement. We hesitate to even suggest a figure from the indeterminate facts outlines above. We do know from the facts that a substantial increase must be made in order to assure finances to execute the remainder of the contract. We would say that $1,200.00 be allotted for parts per engine. We feel that this is again a guess and suggest it only as such; you may evaluate it also and perhaps come up with a different figure. We do know that a revision must be made.
Reimbursements by LAOI) under title II of the Bowen & McLaughlin contract, as compared with the vouchers submitted for rebuilt engines delivered, reflect a progressively accumulative increase in reimbursements for parts *509 during 1951. Reimbursements represent approximately 75 percent of the price of rebuilding the first 312 engines delivered to June 28, 1951; 93 percent of 484 engines delivered to July 26th; 106 percent of 882 engines delivered to September 2; 128 percent on 1,183 engines delivered to September 30; and 138 percent of the price of 1,573 engines delivered to October 28,1951.
In its status report for November 1, 1951 to the contracting officer, Bowen & McLaughlin stated in part:
At no time have we used shafts which deviated from the tolerance specified in ECO 19094 and TM-1731-B, rebuild guides. However, from difficulty experienced in low oil pressure and bearing failure, it has been determined that we must refrain from even leaning to the maximum wear tolerance outlined in the rebuild guide. In other words, in order to solve our low oil pressure and bearing failure problems, we must tighten up on the specifications. This action has resulted in a much smaller recovery of usable standard shafts.
15. On October 25, 1951, Bowen & McLaughlin submitted its proposal for 100 additional engines at a unit price of $732.50, with an increase of $29.66 per unit for dismantling the clutch which had not been required on prior production, and an estimate of reimbursements for parts at $1.200 per engine.
This proposal was negotiated and revised on November 8, 1951, to a unit price for rebuilding of $699.22, on the basis that all non-recurring costs would be included in the first 1200 engines delivered and that later costs be based upon the redetermination proposal. The estimate of reimbursements for parts was reduced to $800 per engine, with the following statement:
In compliance with your request, we shall also use for estimating the allotted sum of $800 per engine_ for purchase of parts which are reimbursable under Title II of the contract. However, we refer you to our letter of October 25,1951, relative to the need for revision of the amount as a requirement for purchasing parts.
The AAA (Army Audit Agency) was requested to commence its audit of costs for the redetermination of price October 23, 1951, and the audit report was received by LAOD *510 on November 19, 1951. The cost experience of Bowen & McLaughlin-, as determined by this audit, was not furnished in evidence in this case.
16. On October 25, 1951, the LAOD received Ordnance Procurement production order No. 1374, dated October 19, 1951, which authorized an increase in the Bowen & McLaughlin contract for rebuilding 750 additional Ford tank engines. A request for proposal was submitted to Bowen & McLaughlin October 29,1951.
On October 31, 1951, Bowen & McLaughlin submitted a proposal by letter for rebuilding 750 additional engines at the identical unit price submitted for the 100 additional engines in the preceding finding and $1,200 per unit for the estimated reimbursable costs for parts. In tins connection, the proposal states:
b. For the indeterminate cost under Title II of the contract, we refer you to our letter of October 25,1951, relative to the need for revision of the estimate of $800.00 per unit, as originally estimated, and our proposed new figures of $1,200.00 per engine.
c. Beference is also made to item 3 of your letter relative to the statement that “Contractor will be required to furnish all the parts necessary for the rebuild of these engines.” It is pointed out that such parts procured by us, of course, will be subject to reimbursement under Title II of original contract.
The LAOD made no effort to conduct negotiations with a view to increasing the Bowen & McLaughlin contract for the 750 additional engines.
About 2 p.m. on October 31, 1951, Wesley M. Sandidge, Chief of the Tank Automotive Branch, and Thomas E. Carpenter, a contract negotiator with the LAOD, visited plaintiff’s plant with a view to interesting plaintiff in rebuilding tank engines. Plaintiff was advised that the Government was in need of about 2,000 additional rebuilt tank engines and would pay for the necessary facilities and the installation thereof.
17. Following the visit of Mr. Sandidge and Mr. Carpenter at plaintiff’s plant October 31, 1951, plaintiff’s general manager, Hi M. Johnson, wrote Mr. Carpenter of LAOD *511 asking for the specifications for rebuilding the tank engines, and a set of prints, if possible. This letter states in part:
We feel completely competent to do this tank engine job by reason of our 10 years of engine rebuilding operations and can see no problems of consequence insofar as equipment is concerned, or the securing of the necessary cooperation from the Ford Motor Company or its suppliers of parts or accessories required for this engine. * * *
* * * Please feel free to discuss any problems that may come to your mind with reference to this job, as we are extremely interested in it and will do our utmost to provide every requirement to the end that we may be approved for a contract covering this work.
On November 1, 1951, Mr. Johnson also wrote Mr. San-didge enclosing a copy of the letter to Mr. Carpenter, further advising that plaintiff was the second largest Ford dealer in the United States and the largest service operation on any consumer setup with a normal stock of parts of approximately $250,000. Mr. Johnson wrote that his prior experience as head of all engine coordination for the Armed Forces, except Aircraft, should make the matter of procurement of parts and accessories considerably less of a problem.
18. The LAOD received the formal proposal from Bowen & McLaughlin November 5, 1951, having received its letter proposal for the 150 engines October 31, 1951. During the period from November 5 to 9, 1951, the LAOD made plant surveys of plaintiff’s plant, the plants of Morrison-Knudsen, Shepherd Tractor, and one other firm which was determined not financially eligible to bid.
Bequests for bids were sent to these three additional firms by the LAOD November 13, 1951, and bids were submitted by them November 26,1951.
The plaintiff’s bid was $911.32 per unit for rebuilding the engines, and an estimated cost of $87.67 per unit for facilities. No estimate was submitted for the cost of parts for reimbursement, but the bid proposal contained the following provision:
(D) 1. The foregoing prices are based on the understanding that the following material is to be furnished by the Government — “Engine parts and paint material”,
*512 2. Contractor’s exceptions to (D)l “Gasoline and Oil.”
In connection with the bid form request for the approximate number of employees, by letter of November 17, 1951, the plaintiff submitted a list of its key employees, experience and years of service, together with a list of its machines and tools.
Prior to submitting its hid the plaintiff requested a specimen engine that could be torn down and rebuilt for a practical test of the time and labor involved. The plaintiff was unable to obtain an engine through the LAOD but did acquire one from another sources for this purpose.
19. Following the submission of plaintiff’s bid of $911.32, a conference was held in the District Ordnance office between plaintiff’s officials and officials of the LAOD. At this time the plaintiff’s representatives were advised that its bid was too high, and plaintiff agreed to refigure it. Eevised estimates were submitted as of November 30,1951, at a unit price of $693.64 for rebuilding the tank engine. This revised price was further adjusted by the elimination of estimates of $48.75 for gasoline and oil and $10 for cleaning solvents and materials that would become reimbursable under title II, as well as certain other reductions, whereby the adjusted bid was reduced to $605.61.
At no time did the plaintiff submit a bid estimate of $800 for parts in rebuilding the engine, or any other estimate of costs for reimbursements under title II. The plaintiff was advised by Wesley M. Sandidge, Chief of the Tank Automotive Division and Mr. Henry C. Genthe, a contract negotiator, that the cost of parts would be about $800 for each engine, and the plaintiff relied upon this estimate in figuring its fixed price bid for rebuilding. However, at a conference on Novemmber 29,1951, between plaintiff’s and Government officials, the proposed contract was discussed in respect to reimbursables, in part, as follows:
Mr. GeNthe. We have a total price submitted by Snyder-Lynch of $605.45 for rebuilding each engine, at an estimated cost of $800 of Government furnished property and replacement parts.
*513 Mr. Sample. The Government has no parts available, so you cannot rely on the Government to get them for you.
Mr. JOHNSON. I don’t think it will be a problem unless it is for example, an unrepairable block.
Mr. Genthe. In the case where you run into an unusable engine, the Government will try to furnish you an additional engine so you won’t have to find a source for a block. Just don’t expect any parts from the Government as our supplies are very low.
Mr. Sandidge. One thing, some parts aren’t included in the direct labor charge.
Mr. Johnson. The camshafts are worked outside. The regrinding of the crankshaft is a reimbursable item. There are some that have to be rebuilt up to be reused. To be remanufactured, they should be a reimbursable item.
Mr. Sandidge. 40% usually are not reworked. We are going to send them into Detroit to be reworked so should be included into it as a reimbursable item.
There is a directive prohibiting any purchase of trucks.
Mr. Sample. You will probably have more work for more motors after this contract so you could buy a lift truck as you would no doubt have plenty of use for it.
Mr. Johnson. If there would be any way you could get us one even if it doesn’t run as we could always get it to work. We do not have any use for one in our own normal work.
Mr. Godfrey. What is the amount of purchase orders we will honor with limitations?
Mr. Sample. You won’t need our approval up to $5,000. We will expect those purchase orders to show why you selected this machine we are going to expect you to buy. $1,000 is a good figure. The P.O.’s will apply to reimbursable payments and Government facilities.
In the meantime the Los Angeles Ordnance District sent representatives to Washington in conferences November 27-29, 1951, to obtain authority to divert the award for the production of 750 rebuilt tank engines from Bowen & McLaughlin to Snyder-Lynch Motors, Inc.
20. A memorandum dated November 30, 1951, for the Board of Awards of the LAOD by H. 0. Genthe, Wesley M. Sandidge and Earle J. Sample, recommended the approval of plaintiff for a contract to rebuild the 750 engines. It *514 contained the following unit price bids as “original proposals

This memorandum stated in part:
It is a matter of continuing concern in the district that Bowen & McLaughlin has been uncooperative in establishing necessary property records, in complying with the conditions of the contract, resisting suggestions to improve the accounting system to a point where reasonable cost data can be ascertained in order to effect a fair price redetermination, apparent disregard of costs incurred by extraordinary expediting, particularly telephone and airplane expenditures; continued attempts to include plant improvement costs where none were agreed upon in the original negotiations, and continually attempting to place this district in an unfavorable light with higher authority.
The Board of Awards approved the plaintiff as contractor at a meeting December 3,1951.
21. Following the receipt of the request for bids dated November 13, 1951, and during negotiations with Mr. Genthe and Mr. Sandidge, the plaintiff requested permission to visit the Bowen & McLaughlin facilities in order to acquaint its officials with the various problems involved in the engine rebuilding program, and to assist plaintiff in preparing its bid. Such a visit by plaintiff’s representatives was denied on the ground that this was a competitive bid and that it would be unethical.
When the first contract was awarded to Bowen & McLaughlin early in 1951 by LAOD, there was very little information available for a determination of the cost or requirements of replacement parts. The estimate of $800 per engine proposed by the contract negotiator was for the purpose of an allotment of funds.
*515 By October 25, 1951, when tbe procurement order was received for tbe additional 750 engines, the LAOD bad also received tbe tabulation of parts required from tbe actual experience of Bowen & McLaughlin to September 30,1951, and other information from this contractor that the cost of parts would substantially exceed the original estimate of $800, and a request for an increase in the allotment of funds.
The plaintiff was not advised of Bowen & McLaughlin’s cost experience for replacement parts known to the defendant. The plaintiff had no information regarding the required replacement of parts, nor the cost of the same at the time its contract was negotiated.
22. Section II-B of plaintiff’s contract provided for reimbursements of the actual net invoice price of parts plus the cost of transportation “upon delivery thereof to the contractor.” However, section II-F of its contract provided that reimbursements under title II would be made in accordance with Part 2 of Section XV of the Armed Services Procurement Regulation, which provides that “the total cost of a cost-reimbursement type contract is the sum of allowable direct costs incident to the performance of the contract, plus the properly allowable portion of allowable indirect costs, less applicable income and other credits.”
No indirect costs were claimed or paid to the plaintiff as reimbursements in connection with the procurement of parts. The plaintiff understood that it would be reimbursed only for the direct costs of parts, represented by the net invoice price plus freight or express. The plaintiff’s estimated cost of procuring replacement parts was included in its final bid estimate for rebuilding the 750 tank engines, as follows:

*516

The foregoing estimates clearly established that the plaintiff understood and intended that its cost of procuring replacement parts would be recovered only through its fixed price contract under title I, for rebuilding the 750 engines. However, the estimate for the procurement of parts was based upon direct costs of approximately $600,000 whereas its actual reimbursables amounted to $1,498,832.84, or almost 250 percent of the contract estimate.
23. On February 11, 1952, LAOD delegated authority to Donald S. Clements to act as the Government expediter at plaintiff’s plant for supplies and engine parts under contract Ord-242. He was required to ascertain quantities of parts necessary and recommend their approval by the contracting officer, to sign all requisitions for property to be furnished by the Government by way of reimbursements, to check prices on purchases and verify all invoices from vendors.
Mr. Clements was furnished the Bowen & McLaughlin mortality table by Mr. Sandidge, as a guide in the determination of parts that would be required. A copy of the same was furnished plaintiff for requisitioning replacement parts.
On April 8, 1952, the contracting officer wrote plaintiff authorizing the issuance of purchase orders, not to exceed $5,000 for any single purchase order, under Article II-B of its contract, but providing that any order exceeding $5,000 required the prior approval of the contracting officer. Most *517 of the purchase orders issued by plaintiff were in amounts less than $5,000.
On July 11, 1952, the contracting officer wrote plaintiff that no purchase order could be changed to increase the price or the method of shipment requiring a premium charge without the written approval of the contracting officer, and requested strict compliance.
24. On May 29, 1952, Mr. Sandidge wrote plaintiff that instructions to Mr. Clements and plaintiff’s personnel to restrict purchases of parts to those amounts listed in the Bowen & McLaughlin mortality table, were to govern the initial purchases only and were not intended to be inflexible, and that plaintiff had been advised to compile a table of parts requiring replacements on the first 50 engines disassembled, upon which purchases would be adjusted. This letter stated that plaintiff’s table of experience had not been furnished and that Mr. Clements had no other authority upon which to base the quantities required, since this method was considered the most accurate one employed and would be complied with whenever and wherever applicable.
The limitation of purchases in accordance with the mortality table was later abandoned because of greater requirements of replacement parts for engines furnished plaintiff, and the approval of purchase orders was thereafter based upon the inventories of parts to make certain that such purchases were necessary.
A mortality table, based upon plaintiff’s experience, was prepared in November 1952, after its rebuilding contract had been completed. It was prepared in cooperation with auditors from the Army Audit Agency and Mr. Lyman of the LAOD.
25. By letter of August 19,1952, plaintiff requested an increase in the estimate for reimbursables under title II of its contract from $600,000 to $1,532,716.63, on the basis of $899,857.49 of parts delivered and outside work to August 5, 1952, and $632,859.14 of parts yet to be received. This letter also requested a change order for an increase of the contract price by $85,449.40 to cover the additional cost of procuring parts.
*518 By supplemental agreement No. 4, dated September 5,1952, the estimate for reimbursables under contract Ord-242 was increased to $1,532,716.63, as reported in finding 6(a) herein. However, plaintiff’s claim for increased costs for the procurement of parts was denied by Wesley M. Sandidge in letter of September 3,1952, which reads in part:
With respect to your request for increased costs, please be advised that the subject fixed price contract was negotiated on the basis that the $600,000.00 amount contained in this contract, was an estimate only and being-such, could be either increased or decreased in value.
In view of the contract being specific as to the estimated value of these replacement parts, your request for an increase cannot be considered under the contract provisions.
26. On November 8, 1952, the plaintiff renewed its claim of $85,449.40, subject to verification of final figures, for costs of procuring engine parts for the account of the defendant in excess of contract estimated requirements. The claim stated in part:
As stated in our claim of 19 August 1952, it is our belief, and we allege, that Ordnance and the Contracting Officer had information at their disposal, indicating that parts replacements would be required in the approximate amount of $1,500,000.00, or more, rather than the $600,000.00 stated in our contract; that Ordnance and the Contracting Officer failed to advise the contractor of this fact at the time of negotiating the said contract; and we further allege that this failure of Ordnance and the Contracting Officer to accurately estimate and make known to the contractor the procurement requirements which would later be imposed, -under the authority given to the Contracting Officer in the said contract, represented gross negligence.
The plaintiff’s claim for its increased cost for the procurement of parts was disapproved by letter of Earle J. Sample, contracting officer, dated November 17,1952, which states in part:
At the time the subject contract was negotiated it was agreed, and the contract so provides, that replacement of parts would be purchased by the contractor for the account of the Government on a cost reimbursement basis. It was not possible to estimate the extent of *519 such purchases under the then proposed subject contract with any degree of accuracy, and therefore such information as was available in connection with other rebuild contracts necessarily was relied upon. Both parties to the negotiations, as well as the contract itself, recognized that the figures used were estimates only. The Government representatives negotiated in complete good faith, and any allegation either of arbitrary action or fraud on the part of the contracting officer or other representatives of the Government is categorically denied.
Further recognition of the difficulty in estimating costs was accorded by the inclusion in the contract of a price revision article which provided for limited upward and unlimited downward revision of price, in accordance with the terms thereof. This article establishes the limits of the contracting officer’s authority with respect to the price adjustments of a general nature, as distinguished from specific adjustments such as those accomplished under General Provision 2, Changes. Consequently your request as submitted is disapproved.
27. In its opinion dated February 24, 1956, ASBCA No. 2837, the Armed Services Board of Contract Appeals held that it had no jurisdiction to grant relief in Count I of plaintiff’s claim for its increased costs of procuring engine parts for the account of the Government.
28. There were approximately 1,700 parts in each tank engine. Prior to the negotiation of plaintiff’s contract Ord-242 LAOD had received a mortality table from another contractor, Bowen & McLaughlin, listing approximately 1200 parts that required some replacements in the first 1,280 engines rebuilt, at an average cost of approximately $992.75 per engine. Approximately 40 percent of the replacement parts were acquired by Bowen & McLaughlin through cannibalization of other engines and the prices of parts in this tabulation were largely taken from the Ordnance price guide which had been compiled some years previous and were substantially lower than current prices.
It is reasonable to conclude that the contracting officer, the contract negotiator and LAOD knew that $800 per engine was inadequate for the cost of replacement of parts prior to negotiating the plaintiff’s contract, but that the estimate of $800 per engine was used in plaintiff’s contract for *520 the firm commitment of funds in the fiscal period, as had been done in the Bowen & McLaughlin contract in early 1951.
29. The plaintiff’s reimbursements under title II of its contract amounted to $1,498,832.84. By deducting $25,900 reimbursed for packaging, marking and shipping surplus parts under supplemental agreements Nos. 6 and 8, and $44,062.50 as estimated cost of gasoline and oil and cleaning solvents (750 engines at estimate of $58.75), the reimbursements for parts, and such repairs of engine shipping crates as required, averaged approximately $1,905 for each engine rebuilt.
The plaintiff’s costs of processing purchase orders, the receiving, inspecting, classifying and storing of parts, and the recording and accounting for the same, substantially exceeded its estimate of $61,559.33 for the contract estimate of $600,000 for parts.
30. The plaintiff claims excess costs for its procurement of parts of $106,681.80, plus a profit of 9 percent which plaintiff had included in its bid on its total plant costs.
The plaintiff’s claim is based upon the direct assignment of compensation paid to a large number of its employees who were directly engaged in the procurement, expediting and handling of parts, plus the apportionment of other indirect costs, less its estimated cost of $61,559.33 included in its bid price for rebuilding the 750 tank engines. The plaintiff’s assignment of salaries for certain personnel wholly to the procurement and handling of new parts is not in harmony with their normal duties. Except for personnel wholly engaged in the purchasing and expediting of new parts, plant personnel employed in the parts department, shipping and receiving, planning and materials control, inventories control and other indirect duties would be normally engaged in the handling of old parts from tom down engines as well as new parts procured for required replacements. It is not possible to make a reasonably accurate assignment of indirect plant expense for these types and classifications.
31. The plaintiff’s contract Ord-242 for the rebuilding of 750 engines and the procurement of parts, as well as its acquisition and installation of facilities for the Government’s *521 account under contract Ord-244, were segregated from its other operations and performed as a Military Division. The plaintiff incurred plant and general indirect expense in connection with these contracts of $394,163.70. The plaintiff has recovered indirect costs of its military division in the following amounts:
(a) Schedule A of its facilities contract Ord-244, as finally amended by supplemental agreement No. 5, specified reimbursement allowances of $19,138.01 for plant overhead, and $6,394.62 for general administration expense. By supplements Nos. 4 and 5 to contract Ord-244, plaintiff was reimbursed $4,815.68 for dismantling, processing, and crating facilities, which included an allowance for plant and general expense of 96.72 percent of direct labor, amounting to approximately $2,367.68. By supplement No. 6 plaintiff was reimbursed $6,916.76 for plant rearrangement and rehabilitation, which included plant and general expense of approximately $252.93. Thus, the plaintiff was reimbursed approximately $28,153.24 of its plant and general expense of its military division under the facilities contract Ord-244.
(b) The plaintiff recovered $192,060 of its plant and general expense on contract Ord-242, on the basis of its original bid, including $130,500.67 for its engine rebuilding performance and $61,559.33 estimated for the procurement of parts for the account of the Government. By supplement No. 7, the plaintiff was allowed $6,000 for the increased run-in time in testing engines on the dynamometer, and by supplement No. 10, plaintiff was allowed $46,020.75 under the contract price redetermination provision. The recovery of plant and general overhead expense for these items amounted to approximately $20,652.24. By supplemental agreement No. 11, the plaintiff was allowed $50,000 by reason of delay in the acquisition and installation of oil pans in all rebuilt engines, reported in finding 6(e), substantially all of which represented plant and general overhead expenses.
Under supplemental agreements Nos. 6 and 8, plaintiff was reimbursed $25,900 for crating, marking and shipping the remaining engine parts after completing the rebuilding of the 750 engines, of which approximately $13,812.24 represented plant and general overhead expense. Thus, the re *522 coveries of indirect costs under contract Ord-242 amounted to $276,524.48.
(c) In addition to the facilities and engine rebuilding contracts the plaintiff performed a sales contract under its military division, against which approximately $1,898.92 plant and general expense was properly allocated.
The defendant contends that an additional $10,301.71 of indirect expense of the military division was recovered by plaintiff through its performance of a “Western” subcontract on the NIKE missile. The performance of this subcontract was commenced in early 1953, and all costs thereof were set up in records separate and apart from the tank engine rebuilding and facilities operations.
The plaintiff’s unrecovered plant and general expense of its military division amounted to $87,587.06, as follows:
Total indirect expense of military division_ $394,163. 70 Less:
(a) Recoveries under facilities contract Ord-244_ $28,153.24
(b) Recoveries under engine rebuilding contract Ord-242_ 276, 524. 48
(c) Recoveries on its sales contract_ 1, 898. 92 306, 576. 64
Balance, unreeovered plant and general expense_ 87, 587. 06
32. The plaintiff sustained an overall loss of approximately $220,000 in the performance of contracts Ord-242 and Ord-244.
Plaintiff was reimbursed $1,472,932.84 for costs, other than its cost of packaging, marking and shipping unused parts ($1,498,832.84 — $25,900). This represents approximately 145.5 percent in excess of the estimated reimbursables of $600,000 under title II of contract Ord-242. By applying this overage of 145.5 percent to plaintiff’s estimated cost of $61,559.33 for procuring such parts, gives the sum of $89,568.82.
Had the plaintiff been allowed its indirect costs of procuring replacement parts under the provisions of part 2, section XV of the Armed Services Procurement Regulation, its reimbursements under title II would have been increased by such costs.
*523 Had consideration been given to its costs of procuring replacement parts in the redetermination of price for the fixed price part of its contract, the plaintiff might reasonably have been allowed the recovery of such costs under title I of its contract.
It is reasonable to conclude that the unrecovered indirect cost of $87,587.06 for plant and general expense of its military division fairly represents its cost of procuring tank engine parts of approximately 145.5 percent over and above the estimated contract requirements.

Cownt II

33. The plaintiff contends that defendant’s inspectors and agents interfered with plaintiff’s usual and customary operations and imposed certain requirements in violation of the contract provisions and specifications for the rebuilding of tank engines under contract Ord-242.
The defendant regularly maintained at least five inspectors at plaintiff’s plant during the performance of its contracts. Francis C. Jones was the resident inspector of ordnance, sometimes referred to as RIO, from late January until May 26, 1952. He was followed by W. H. Buchman as RIO, until the contracts were completed. J. L. McLaughlin was the chief inspector in charge of plaintiff’s contracts until sometime in August, when he was succeeded by Ollie Harris as acting chief inspector.
Substantially all of the irregularities complained of occurred during the period of assignment of resident inspector Jones, hut some of the resulting increased costs continued thereafter.
34. Tower gears. The GAA tank engine contained a set of gears in the housing over the end of the camshaft that are sometimes referred to as tower gears. The set consists of two bronze gears, known as camshaft gears, and a steel wormdrive gear. They come in matched sets, and the set number is stamped on each gear, with designations for the left and right camshaft gears. The bronze gears bear “timing” marks which are aligned with corresponding timing marks on the camshaft support to facilitate the assembly. The steel worm gear is then inserted in the cam *524 shaft support and meshed with the camshaft gears by clockwise turning. These gears required replacement only when excessively worn or when they had chipped or missing teeth. The Technical Manual for maintenance of the engine states:
(4) Gears (fig. 69). Replace the bronze camshaft gears if they are excessively worn or have chipped or missing teeth. Pitted tooth flanks do not necessarily indicate a replacement is necessary. Check the worm gear for worn or damaged teeth; also check the diameter of the bearing surface at the lower end of the worm gear. The manufacturer’s dimensions are 1.2495 inches to 1.2500 inches. If the gear is worn to less than 1.2480 inches, replace the worm gear.
The tolerance allowance for this set of gears was very close, and, unless it was immediately determined that the entire set was to be replaced with a newly matched set, each set of gears should have been kept together for replacement in the same engine cylinderhead from which it came. In disassembling the engines the plaintiff kept each set of tower gears together, wrapped in wax paper, wired together, and marked to correspond with the engine from which they were taken.
35. About April 1952, after the plaintiff had disassembled approximately 150 sets of camshaft gears, Chief Inspector McLaughlin and Jones advised plaintiff’s officials that all these gears were to be replaced with new gears, and personally separated a number of sets, tossing the bronze gears in one box and the steel worm gears in another box, in like manner as though scrap was being segregated according to its metallic content. Plaintiff protested the separation of these gear sets, because most of them were within the tolerances for reuse and because of the difficulty in obtaining new gears. The plaintiff contends that the separation of these gear sets was continued until about the end of June 1952, when approximately 470 engines had been disassembled. There is no satisfactory evidence of the number of gear sets that had been separated upon the instruction of Mr. Jones, but the number was substantial.
Shortly after purchasing a number of new gears for replacement, the plaintiff was instructed to reuse the gears that *525 had been taken from the engines which had been disassembled, and had been separated. It was impossible to rematch gears of the original set, and plaintiff experienced much difficulty in fitting these gears for meshing within the required tolerances. Inspector Gordon Drake designed a fixture which the plaintiff had built for use in matching and fitting the gears together properly before assembling them in the camshaft housing. It was extremely difficult to match gears of different sets within the close tolerance requirements, and any misfits resulted in noisy cams when tested on the dynamometer. Noisy gears sometimes required the removal of the entire rear of the engine to check the gear network.
36. Bowen & McLaughlin had replaced 93 upper bronze gears priced at $13.04 each and 39 worm drive gears at $15.85 each in rebuilding 1,280 engines. The plaintiff purchased approximately 1,940 upper bronze gears at a cost of $23 each, and 200 upper worm gears at $43.10 each. The plaintiff actually used for replacements 1,616 of the new bronze gears and only 89 of the new worm gears purchased. Each engine required 2 sets of these gears, or 4 bronze and 2 steel worm gears.
There is no evidence that the plaintiff made any written complaint upon the requirement to reuse and match up gears that had been previously separated upon instructions of the defendant’s inspectors. It is not possible to make a determination of the additional work and extra costs involved in matching and fitting gears of different sets.
37. Push rods and cups. The rebuilding specifications required that push rods and cups be Parco-lubrited with a dry rust resistant lubricant. During part of the period that Jones was inspector in charge at plaintiff’s plant, plaintiff was required to process the push rods and cups to take off the glazed surface from the cups so that the Parco-lubrite would penetrate sufficiently to adhere to the metal and not peel off after treatment and use. This required the mixing of the push rods together as they were put through a tumbling operation known as “wheelabrating.”
The Technical Manual for the maintenance of this type of tank engine states that a tray should be provided for hold *526 ing the push, rods so that they could be kept in order and reassembled in their original position in the engine. The plaintiff contends that the mixing of push rods and cups increased its work and costs in gauging and fitting the push rod cups in valve guides of different engines.
Plaintiff’s plant superintendent stated that, prior to the time wheelabrating was required, special racks were made and the push rods and cups from each engine were placed in a separate rack in numerical order as they were removed from the cylinder head, and that each rack was numbered to correspond with the cylinder head from which it came. The Parco-lubrite processing was performed by an outside firm under a subcontract. Plaintiff stated that they were returned in the same position in the rack as when they were sent out. It would not be practical or feasible to separately Parco-lubrite these parts for each engine, and maintain them on the rack in the same position as they came from the cylinder head. Neither would it be practical or feasible to reassemble the push rods and cups in the same order as they were removed from the engine cylinder head where machining of the stems or cups was required, as in the rebuilding operations herein.
There is no evidence that the plaintiff had made any written complaint to the LAOD of any additional work or costs involved in this operation.
38. Push rod guides. The rebuilding specifications ECO 19094 provide for the removal of valve guide bushings if unserviceable, or if of the 'long (old) type. It required that valve guide bushings be checked for cracks, score marks and size, the polishing of the inside diameter of the push rod and valve stem hole in the bushing and the reaming of any undersize valve stem guide bushings. The Technical Manual noted that valve guides are machined to size at the factory and do not require reaming after installation in the cylinder head. The manufacturer’s dimensions for the inside diameter of the push rod guide was specified at 1.920 to 1.921 inches and any that were worn more than 1.923 inches required replacement. There is nothing in the maintenance manual, nor the rebuilding specifications, that requires the removal of any push rod guide except those that *527 had worn beyond allowable tolerance or were the long old type guide.
Sometime after a number of engines had been tom down and the cylinder heads were reconditioned in the rebuilding operation, Mr. Jones instructed plaintiff’s officials to remove all push rod guides as they were to be replaced with new parts. There were 16 push rod guides in each cylinder head, or 32 in each engine. The push rod guides were steel, whereas the cylinder heads were made of aluminum so that removing these guides oftentimes enlarged the hole in the cylinder head and the same guides could not be replaced and had to be scrapped. There were comparatively few of these push rod guides that required replacement because of wear beyond allowable tolerances. The mortality replacements by Bowen & McLaughlin for its first 1,280 engines rebuilt required replacement of only 100 push rod guides. They were priced at $3.18 each.
39. When Mr. Buchman was placed in charge of inspection at plaintiff’s plant he directed that removal of push rod guides be discontinued, except when replacements were required. The inside gauging, polishing, and inspection of push rod guides was regularly performed without removal of the guides. Parco-lubrite was not required of push rod guides, but only for the rods and cups.
There is no satisfactory evidence of the number of engines from which all push rod guides were removed upon the direction of inspector Jones. However, the plaintiff purchased a total of 9,098 push rod guides, which would be the equivalent to complete replacements for 284 engines. The plaintiff used only 5,964 of these new guides, so it is obvious that a substantial number of guides that had been removed were reconditioned and fitted in the reassembly of the cylinder head. The plaintiff’s cost of these parts was $6 each.
There is no evidence that the plaintiff submitted any written complaint upon the resident inspector’s requirement for the removal and replacement of all push rod guides in many of the rebuilt engines. There is no satisfactory evidence of the additional cost involved.
40. Bearings. The GAA tank engine contained five main bearings. There were 4 pairs of connecting rods, each of *528 which required 2 half-bearings, substantially all of which required replacement. It appears that the connecting rod bearings for all of the undersized crankshafts, referred to in the .020 size, were reprocessed, whereas the standard size bearings were purchased new.
The Bohn Aluminum & Brass Company of Detroit performed the silver babbitt or plating for plaintiff in reconditioning these bearings. The same firm had reprocessed bearings for Bowen & McLaughlin, and it had experienced difficulty with the babbitt pealing off when the engine became heated in final tests. In order to avoid this trouble and eliminate bearings with poor plating, these reconditioned bearings were boiled in oil to about 800 degrees’ heat, or the approximate maximum that might be attained in operations of the engine. This boiling of reconditioned bearings was still in progress about March 1952, when inspector Jones visited the plant of Bowen & McLaughlin.
Chief inspector McLaughlin and resident inspector Jones determined that the plaintiff should use no reconditioned bearings unless they were first tested by boiling in oil. When bearings were received by plaintiff they were locked in a storeroom by Mr. Jones. Plaintiff was required to boil these bearings in oil before installing them in the engines. They were released in small lots for processing and installation as required for rebuilding the engines.
The plaintiff found no defective bearings in the lots that were treated, but contends that the boiling of bearings in oil was continued until Inspector Jones left the plant. There is no satisfactory evidence of the number of bearings that were so processed by the plaintiff. However, careful handling of each small lot so processed was required, in order to avoid any damage to the babbitt plating, and it slowed down the plaintiff’s rebuilding operations.
The test boiling of reconditioned bearings was not required by the rebuilding specifications. There is no satisfactory evidence that the plaintiff had made any written complaint for this requirement, and the increased cost thereof is not determinable.
41. Oylmder sleeves. There were eight cylinder sleeves in each engine cylinder block. The fitting of cylinder sleeves *529 allowed a manufacturer’s tolerance of not more than .002 inches. Any cylinder sleeve that was not within the allowable tolerance had to be replaced unless it was cleaned and honed down to such tolerance allowance.
During the plaintiff’s performance, the defendant’s chief inspector McLaughlin and resident inspector Jones instituted a ruling that where more than three cylinder sleeves required replacement because of excessive wear, or were not otherwise within the allowable tolerance, then all of the eight cylinder sleeves in the engine would have to be replaced. Plaintiff orally protested the removal and replacement of the cylinder sleeves that were in good condition because they were very difficult to obtain and the cost was $39.50 each.
In order to pull these cylinder sleeves it was necessary to preheat the cylinder block in an electric oven to obtain the required expansion of the aluminum casting. The cylinder sleeves that were removed were not scrapped, but were stored by plaintiff in a prescrap area. After Mr. Buch-man became resident inspector the plaintiff took up the matter of usable cylinder sleeves with him, and Mr. Buchman required that all good sleeves must be used in the reassembly.
42. Bowen & McLaughlin, currently engaged in rebuilding the same type tank engine, removed and replaced only those cylinder sleeves that were in bad condition or not within the allowable tolerances. The experiences of Bowen & McLaughlin was 5,312 cylinder sleeve replacements for its first 1,280 engines rebuilt. They were priced at $25.31 each.
The plaintiff purchased new 3,119 cylinder sleeves for its entire contract of 750 rebuilt engines, representing a replacement requirement of 4.15 per engine which was identical to the replacement mortality experienced by Bowen & McLaughlin in rebuilding 1,280 engines. The plaintiff actually used only 1,967 new cylinder sleeves so that its actual replacements averaged only 2.62 per engine.
It is reasonable to conclude that any ruling by defendant’s inspectors for the replacement of cylinder sleeves that were not defective must have been corrected almost immediately after it was issued. Any additional cost of the removal and *530 replacements of cylinder sleeves that were not defective would have been of minor significance. Plaintiffs actual replacement of cylinder sleeves was substantially less than that of Bowen & McLaughlin.
43. Rejections of work. In April 1952, the resident inspector Jones and his assistant Eugene B. Head rejected some twelve substantially completed engines by red-tagging them. Plaintiff was advised that some of the crankshafts were pitted and others showed evidence of abrasive material that had accumulated during refacing of the valve seats of the cylinder heads without proper flushing. The crankshafts had been cleaned and checked for cracks under a special electric light, known as a magnaflux. Some of the pitting complained of was on the flange which protrudes from the engine for mounting of fly wheel, whereas in two of the engines rust pits were apparent in the area where the pans are mated against the crankshaft, which required further cleaning to avoid rust damage to the cell.
These engines were disassembled and cleaned to the satisfaction of the inspectors and the crankshafts were replaced. The plaintiff contends that the pitted crankshafts were reused in other engines without further processing and that no grindings were found in the internal combustion areas. However, there is sufficient evidence for the determination that the work rejected was not entirely satisfactory.
44. By memorandum dated May 10, 1952, resident inspector Jones wrote chief inspector McLaughlin that cylinder heads for 8 engines had been rejected, and plaintiff was forced to remove some additional cylinder heads from assembled engines and to disassemble them to wash out the abrasive material before they were reassembled and installed in engines. It was requested that a meeting be called with the contractor’s management to correct other matters of a similar nature. This complaint involved some 10 to 12 cylinder heads in addition to about 4 engines on the rack in final assembly. Soil and grindings were found in both the intake and exhaust ports.
By letter of May 14,1952, the plaintiff wrote the contracting officer requesting a change order and confirmation of the verbal instructions received. Plaintiff stated that the per *531 formance of the additional operations required would not affect the functional qualities of the rebuilt engines and were not mandatory requirements that conformed to the usual and customary rebuilding methods. The plaintiff complained that it was required to tear down and reassemble 14 head assemblies which had been previously reconditioned, assembled and attached to the engine blocks, because of smudge traces in the exhaust ports and the possibility that there might have been metal particles in the concealed portions, which proved untrue.
There is no evidence of any written reply to plaintiff’s complaint and request for a change order. No change order was issued for the work involved in disassembling 'and re-cleaning these cylinder heads.
Prompt inspection and approval of all parts involved in the cylinder head assembly might have avoided the work of disassembling them for recleaning. However, it was the contractor’s responsibility to maintain the parts and subas-semblies in a satisfactory condition until final acceptance of the work. These parts were not so maintained by the contractor.
45. On one occasion the resident inspector refused to accept an engine because of a rough area on the engine head that Was required to be removed in order that the new paint would properly adhere to the surface. The plaintiff attempted to clean the surface with a wire brush, but found that it was a discoloration caused by the heat of the engine, and it could not be removed because of penetration of the metal. Only one engine was involved in this hand-cleaning operation.
46. When resident inspector Jones left the plaintiff’s plant the plaintiff had 22 tank engines completed with final test runs on the dynamometer, but they had not yet been accepted for the Government. All openings had been sealed, a pickling preservative placed in the oil tanks, and the engines were already placed in shipping crates.
On June 12, 1952, resident inspector Walter H. Buchman issued a blanket approval with certificate of inspection under his supervision of 24 engines that had been previously test *532 run. These engines had their final test run on the dyna-mometer during the period from May 12 to June 7, 1952. Each test log had been signed by one or more Government inspectors. However, before accepting these engines, Inspector Buchman required that a further test run be made on the dynamometer of about 15 minutes for each of these engines.
The plaintiff was required to untape the sealed openings, drain the pickling solution, flush and replace with oil and then connect the engine with the dynamometer for a 15 minute run. Upon completion the reverse operation was performed and the engines again placed in shipping crates.
Resident inspector Jones remained at the plant several days after the arrival of Mr. Buchman on May 26,1952.
When certain defects were noted in the final test run of an engine that required correction, it was sometimes necessary to make an additional short test run or penalty run of the adjusted engine. There is no satisfactory evidence that any of these engines required adjustments that would necessitate a penalty test run of the dynamometer.
The plaintiff was awarded an increase of $8 per engine under supplemental agreement No. 7, because of increasing the final test run on the dynamometer from 4% hours to 5 hours and 10 minutes. A reasonable allowance for the penalty run of 15 minutes on each of the 24 engines that had been previously tested, including the time required in preparing the engine for the test and restoring it to the shipping crate, is approximately $25, or $600 for the 24 engines so tested.
47. There is no evidence that the plaintiff made any written complaint about the administration or inspection of its contract performance except as noted in finding 44. The plaintiff’s officials concede that the defendant’s inspection was entirely satisfactory after Walter H. Buchman was installed as resident inspector. Some difficulties continued with noisy engines which the plaintiff attributed to the matching of gear assemblies.
On May 2, 1952, while inspector Jones was still in charge at plaintiff’s plant, the plaintiff submitted a bid for the rebuilding of 1,050 additional tank engines of the same type *533 as it was then rebuilding. Plaintiff bid a unit price of $605.65 for the rebuilding of these engines, under a similar type contract, with a redetermination of price clause for increasing the price not more than 10 percent. It also submitted an alternative bid for a fixed price of $650 without the redetermination of price provision. Plaintiff failed to receive the award of this work, which was awarded to Brown & Root, Inc., of Houston, Texas under the St. Louis Ordnance District.
48. In October 1952, plaintiff’s comptroller submitted to Mr. Root, the AAA resident voucher auditor at plaintiff’s plant, a detailed tabulation of monthly costs on which its claim for excess costs was made to June 30,1952, and for the redetermination of price to September 30,1952.
Commencing in October 1952, a full redetermination of price audit was performed by AAA auditor Harry D. Larson.
By supplemental agreement No. 10, dated July 15, 1953, plaintiff’s contract was increased by $46,020.15 under Article 33, redetermination of price. The basis upon which this sum was determined and agreed upon has not been furnished in evidence in this case. Neither has the AAA audit report on price redetermination. However, the parties agree that approximately 39.1 percent thereof represented indirect expense consisting of plant burden and general expense, which was reported in finding 31 (b). Thus the redetermi-nation of price agreement would consist of approximately $18,270.24 for indirect factory burden and general administration expense, and $27,750.51 for direct labor. It is reasonable to conclude that the direct labor allowance in the redetermination of price agreement largely represented increased labor costs prior to July 1952.
49. The plaintiff’s claim of $92,544.18 is based upon its unadjusted excess performance costs up to June 30, 1952, as compared with similar costs for July 1952, except for indirect costs consisting of plant overhead and general expense which was applied at the July ratios for both periods.
Plaintiff’s unadjusted direct labor to June 30, 1952, was $106,091.95, to which plaintiff added the July rate of factory burden of 57.8 percent, and the July general adminis *534 trative expense of 4.977 percent to its total plant cost, giving a total cost of $175,745.25, representing a unit cost of $1,273.51 for 138 units completed and shipped by June 30, 1952.
Plaintiff’s direct labor for the month of July 1952, was $52,778.25, and by applying the same rates for factory burden and general administrative expense we find a total cost of $87,419.81, or $602.90 per unit for 145 engines completed during that month.
The difference of $670.61 per unit was then applied to the 138 engines completed to June 30th, for which plaintiff claimed $92,544.18.
The plaintiff’s theory of its claims is that the defendant’s inspector Jones was responsible for all excess costs to June 30, 1952, which is not sustained by the evidence. Plaintiff’s accounting fails to make any adjustment for the substantial inventories accumulated to June 30, 1952, which were used and benefited July operations. Plaintiff had disassembled approximately 472 of the engines to be rebuilt by the end of June. In excess of 40 percent of the costs of all subas-semblies had been completed and about 22 additional engines were substantially completed by June 30,1952.
50. The defendant, without conceding the correctness of plaintiff’s theory of recovery, made an audit of plaintiff’s cost comparisons to June 30, 1952 and July 1952, with adjustments for inventories of work in process at the end of both periods, and applied the July rates for factory burden and general administration expenses. The excess cost for the 138 engines delivered to June 30 was determined to be $15,320.76 or $111.02 per unit. However, in adjusting the period costs, the defendant used the average cost per engine for all subassemblies, since there were no inventories available of the various subassemblies. Any excess costs that may have resulted from the inspector’s first decisions, to replace all tower gears and push rod guides would have been incurred in the subassemblies of these parts. There is no proof that any such costs would have increased the factory burden or general administrative expense. In any event, all such indirect costs have been made the subject of accountability under count I of this report.
*535 No allowances or adjustments were made for starting up costs prior to July 1 for comparison with the July performance costs. During the early period of operations the plaintiff lacked important tools, instruments and facilities for the rebuilding of tank engines of this type. Many of these were later furnished directly by the Government.
There is no satisfactory proof of any excess costs that may be attributed to any improper action or failure on the part of defendant’s inspectors or officials. A fair and reasonable estimate for the test penalty runs of 24 engines reported in finding 46 is $600.
51. On November 3, 1952, after all rebuilt engines had been completed and delivered under contract Ord-242, plaintiff submitted a claim to the contracting officer at LAOD for the sum of $92,544.18, as an equitable adjustment of the excess cost for 138 rebuilt engines up to June 30,1952. This claim was based upon the allegations of improper inspection and rulings by resident inspector Jones which resulted in its increased costs, as claimed.
By letter of November 17, 1952, Earle J. Sample, contracting officer, disapproved the claims as submitted because the essence of the claim was breach of contract.
On February 2, 1956, the Armed Services Board of Contract Appeals in ASBCA No. 2836 held that insofar as this was a claim for damages for breach of contract it had no jurisdiction, and upheld the contracting officer in denying the claim for lack of authority.

Oount III

52. When plaintiff negotiated its contracts Ord-242 and Ord-244, its total assets were slightly less than $500,000. They consisted largely of fixed assets in plant and inventories of its auto agency and motor rebuilding operations. Plaintiff estimated its required working capital for the performance of its contracts at about $390,000, and that this would be provided in part by borrowing from the bank where it had established credit. Mr. Sandidge and other LAOD officials were fully informed of plaintiff’s financial condition prior to the award of its contracts.
*536 53. On May 19, 1952, plaintiff complained of the delay in payment of reimbursements vouchers. Plaintiff complained that since early in April 1952 the delays in reimbursements were from 2 to 3 weeks, which was beyond the discount period of 10 days normally required, and yet the AAA auditor insisted upon all discounts in approving the net voucher for payment. It was pointed out that in 2 items where the invoice was billed “net” the AAA auditor telephoned the vendor and obtained a concession of 1 percent for payment in 10 days, and, even though the discount period had expired, the AAA auditor deducted the amount of discount from plaintiff’s voucher.
54. All reimbursement vouchers were pre-audited by the Army Audit Agency before payment by the finance officer at LAOD. In accordance with paragraph II-B of its contract, upon delivery of replacement parts to plaintiff, items were checked in by ordnance inspectors and freight bills and invoices were verified. The plaintiff then drew its checks in payment. The AAA auditor required that the check number be designated on each invoice of the vendors that were vouohered for reimbursement. When the voucher was submitted for audit and payment, the checks issued to such vendors were then signed and mailed out to them.
This procedure was worked out with the AAA and the contracting officer was advised thereof. A similar procedure was practiced by Bowen & McLaughlin in obtaining reimbursements for replacement parts and facilities purchased for the account of the Government.
In order to expedite the preaudit of the plaintiff’s reimbursement vouchers AAA auditor C. W. Boot was regularly assigned to the plaintiff’s plant, commencing about the end of June 1952, to receive and audit these vouchers. By this time unpaid vouchers had accumulated to approximately $100,000.
55. By letter of September 18, 1952, the AAA reported to LAOD that during recent examinations of costs pertaining to voucher audits, and in review of certain costs preliminary to the price redetermination audit, it was found that plaintiff’s records were delinquent in many respects. It was pointed out that checks drawn in payment of invoices were *537 posted before the liability for such invoices was recorded, which reflected an understatement of accounts payable. In a reconcilement of plaintiff’s bank statement for July 1952, it was determined that outstanding checks of $382,031.90 would result in a bank overdraft of $194,713.07. This matter had been discussed with plaintiff’s comptroller, who explained the procedure as reported in the preceding finding, that many of the checks issued upon delivery of parts and verification of invoices were not actually outstanding, but were held by him for later release, amounting to approximately $179,389.70. But even considering the amounts for which payments were not yet due, the overdraft would be in excess of $15,000 upon payment of other checks issued.
The AAA recommended that the contracting officer instruct the contractor to bring its records into a current basis and maintain them in accordance with recognized practices, and that the contractor be instructed to provide weekly bank statements for use of the AAA auditor in verifying payments of checks issued.
The contracting officer was advised that the AAA would continue to make its audit determinations with the understanding that invoices supporting the reimbursement vouchers had been paid or were in the process of payment, but that in the event it was disclosed that vendors’ invoices were not paid promptly, recoupment would be made of costs previously approved. The contracting officer was advised that under this procedure the AAA auditor would permit a reasonable lapse of time for the clearance of checks and payments by the bank.
56. On September 26, 1952, the contracting officer wrote plaintiff that the AAA audit was made upon his request and enclosed a summary of the same. The observation was made that plaintiff’s working capital was apparently inadequate to finance its current operations, and plaintiff was advised that this made it necessary to have evidence that checks in payment of vendors’ invoices were paid and cleared by the bank in order to protect the interests of the Government. Accordingly, the plaintiff was requested to furnish the AAA auditor of reimbursement vouchers its bank statements weekly in order to currently verify the payment of checks *538 for invoices supporting reimbursement vouchers. Plaintiff was also advised, in the event checks were not cleared within a reasonable time, recoupment would be made for the amounts outstanding.
Plaintiff’s comptroller wrote the contracting officer October 2, 1952 that no transaction or entry in plaintiff’s books was incorrectly stated, and that checks were made up prior to the preparation of reimbursement vouchers so that the check numbers could appear on paid invoices, and in all cases were mailed out prior to the receipt of reimbursements from the Government for the costs incurred.
57. Plaintiff’s practice of holding back checks payable to vendors until reimbursements were obtained from the Government was not unique or exceptionally applied by plaintiff. Bowen & McLaughlin, the only other contractor for rebuilt tank engines in the LAOD, wrote that office July 13, 1951, complaining of delay in the reimbursements of its vouchers amounting to $84,366.12, stating in part:
This delay has caused us to hold back checks approximating $62,000.00 which we have written but have been unable to mail to our vendors in settlement of their accounts, thus necessitating the loss of discounts which we would have been able to take had the funds due from Los Angeles Ordnance District been available.
58. The War Department Technical Manual TM 11 — 1000 specified the administrative audit procedures for cost-plus-a-fixed-fee supply contracts, and for fixed-price contracts which contain a provision for reimbursement of tooling, training, or plant rearrangement on a cost basis. It provides in part:
13. Reimbursement of Costs.
a. It is intended that the contractor be reimbursed promptly and thus be enabled to regain his capital for use in further production. Prompt reimbursement also minimizes the need of the contractor for advances from the Government.
b. For the purpose of reimbursement, costs normally will be considered as expended when — in the case of direct charges the cash has been paid out or the bank check drawn and placed in the mail and, in the case of overhead when the amounts of the liabilities for the *539 items included therein have been definitely established or are based on reasonably accurate accruals.
‡ $ * $ $ * #
f. A period of 90 days will be allowed for clearance of checks covering reimbursed direct charges as defined in paragraph 28 and deduction will then be made for any uncleared checks. * * *
The reimbursements to plaintiff for replacement parts in rebuilding the engine and the acquisition of facilities did not include any overhead, but only direct charges.
The plaintiff contends that it relied upon the provision of the Government manual and that the allowance of 90 days represented a reasonable time for the clearance of checks for payments under reimbursement vouchers.
59. Plaintiff’s reimbursement voucher No. 60, under contract Ord-242, for $40,164.88 was dated October 28, 1952, received by the AAA auditor October 30, and the audit completed November 20, 1952. The voucher contained a suspension notice for $40,141.49, representing the recoupment of checks outstanding on other paid vouchers for more than 30 days from the receipt of the voucher by the AAA. The 30-day limit was established as a reasonable time for clearance by the Chief of the Los Angeles branch office of the AAA. The suspension notice was executed by the contracting officer November 25, 1952, and the net balance of $23.39 was paid November 30,1952.
By letter of December 1, 1952, plaintiff protested the notice of suspension and recoupment of prior payments from its voucher No. 60, as being arbitrary and capricious and not within the provisions of its contract. All of the checks listed as unpaid and recouped had cleared the plaintiff’s bank account by November 20, 1952, except 3 checks amounting to $18,809.61, of which check No. 2360 dated September 24, 1952 to the Western Gear Company was in the sum of $18,400.
Plaintiff’s voucher No. 61, dated November 8,1952, under contract Ord-242, in the amount of $78,401.08 was suspended in the amount of $46,933.73, December 8, 1952, of which $45,782.51 represented recoupment for checks outstanding more than 30 days. The balance of $31,467.35 was paid December 16,1952.
*540 Plaintiff’s voucher No. 62, dated November 5, 1952, for $6,229.99 was suspended in full December 15, 1952. Prior to the suspension of voucher No. 60, no discussions were had between plaintiff and LAOD of what constituted a reasonable time to allow for the clearance of checks payable to vendors on which reimbursements were claimed.
60. On December 80, 1952, the contracting officer wrote plaintiff in reference to its protests of December 1 and 12, 1952, for the recoupment of payments on prior vouchers. The plaintiff was advised that under title II of the contract Ord-242, the contractor would be reimbursed for its costs. The contracting officer stated “This means payment must have been made to your vendor before a voucher can be accepted reimbursing you for such cost.”
In the interim period the LAOD received a number of complaints from plaintiff’s suppliers, and when it was ascertained that plaintiff had been reimbursed for certain invoices for which they had not yet been paid, they threatened to place the plaintiff in bankruptcy.
All of plaintiff’s reimbursement vouchers were prepared in the name of and payable to the Bank of America N.T. & S.A., Assignee of Snyder-Lynch Motors, Inc. When the bank received the first notice of suspension and recoupment on voucher No. 60, it declined to extend any further credit to the plaintiff, and froze plaintiff’s funds on deposit to apply against its previous loans.
At the end of October 1952, plaintiff’s bank account reflected a balance of $83,465.37, but checks issued and outstanding or withheld for additional deposits amounted to approximately $406,525.66.
The defendant’s officials knew the financial condition of plaintiff. Weekly bank statements were furnished the AAA auditor, commencing in October 1952, in accordance with the request of the contracting officer of September 26, 1952.
61. The contracting officer conceded that the Government had no legal obligation for payments to the plaintiff’s suppliers. Most of the engine parts that had been supplied were incorporated into the rebuilt engines that were delivered in full by October 31,1952. Plaintiff had been engaged in packaging, marking and shipping surplus parts since *541 November 1, 1952. There is no evidence of the dates of payments for Touchers under Title I of contract Ord-242. On the assumption that the basic contract price had been paid by November 30,1952, there remained unpaid balances under both contracts of approximately $564,017.21, reported in findings 7 and 11 as follows:

Of the unpaid balance of $564,017.21 plaintiff earned $30,-715.68 after October 31,1952, including an allowance of $25,-900 for packaging, marking and shipping of engine parts and $4,815.68 for dismantling, crating and shipping Government facilities under contract Ord-244. Plaintiff had not prepared all vouchers for its reimbursement of parts by November 30, 1952. Neither had vouchers been prepared for all facilities because they were not completely inspected and accepted for the Government’s account. It is reasonable to conclude that the contracting officer knew the Government’s approximate liability under these contracts.
62. As a result of the defendant’s position that the plaintiff must pay its liabilities for costs incurred for engine parts before it could be reimbursed, plaintiff set up an escrow account with its bank whereby its creditors could be equitably paid as funds were realized. Plaintiff sold its motor business, including the Ford franchise, about March 1953. Plaintiff claims that it sustained a loss in such sale of $582,883.89 which was attributable to the withholding of funds for its reimbursable costs. However, plaintiff’s loss is computed upon intangible assets of $643,117.62, capitalized and evaluated upon six times average yearly earnings of $131,626.63 for 1947 and 1948.
The net book value of inventories and fixed assets sold was $196,178.19. The sum of $256,411.92 was realized upon the sale of these assets. The average annual earnings for *542 the 5 years immediately preceding the sale, from 1948 to 1952, inclusive, was $84,931.69. The net tangible assets employed in its business for a profit amounted to $552,808.35. By allowing an average earning rate of 10 percent to such tangible assets, amounting to $55,280.84, the excess average earnings of $29,650.85 would be reasonably attributable to the intangible asset value of its business.
A fair and reasonable basis for the capitalization of earnings in the type of business that the plaintiff operated, would be 5 times such earnings, representing a capital value of $148,254.25. The total value of fixed assets and inventories of $196,178.19, plus the value of intangibles included in the sale, would be $344,432.44, and the net loss thereon would be $88,020.52.
63. The final payments under contract Ord-242 were made made in 1955. All deliveries under this contract were made by October 31, 1952, and had contract adjustments and reimbursements been made promptly such payments might have been completed by December 1,1952.
The interest cost to plaintiff on delayed payments at the rate of 5 percent per annum from December 1952, would amount to approximately $12,240.

Oowvt IV

64. Shortly after plaintiff began the acquisition and installation of facilities under its contract Ord-244, it was found that the estimate of $64,100 was substantially inadequate to cover the costs.
By letter of January 31, 1952, plaintiff listed additional equipment required and increases in cost of items previously authorized, which revised the estimate to $122,813.77. Plaintiff specifically cited the increase required on the dynamom-eter test run-ins from 4*4 hours to 5 hours and 40 minutes, which would require an additional honing machine.
Supplemental agreement No. 1, dated April 4, 1952, increased plaintiff’s schedule of equipment to $94,803.75 for which payments would be reimbursed. However, the increased cost for the additional dynamometer run-in tests under contract No. Ord-242 was not provided for until December 8,1952 (Finding 6 (c)).
*543 By letter of April 15,1952, the contracting officer advised plaintiff that it must adhere to the contract items exactly as to quantity and as nearly as possible to the description and if the exact item as indicated in the contract could not be procured, plaintiff should request substitution before proceeding with the procurement.
The plaintiff’s first voucher under its facilities contract was suspended by the AAA on April 14, 1952, and such action sustained by the contracting officer April 21, 1952, for the amount of $15,521.61, because the description of items purchased failed to conform exactly with schedule A of its contract Ord-244.
Thereafter, from time to time, plaintiff made additional purchases of tools and equipment required for the performance of contract Ord-242. The purchase orders and necessary installations were first taken up with defendant’s representatives at plaintiff’s plant, but no reimbursements could be made until such items were approved in writing by the contracting officer.
65. Written authorizations were issued by the contracting officer from time to time, and the Government also supplied a substantial amount of additional equipment required for rebuilding the engines under contract Ord-242.
Final inspection and acceptance of the facilities and equipment was made in February 1953. On February 11, 1953, the contracting officer wrote plaintiff, attaching a memorandum to LAOD property officer accepting the costs and amounts of material consumed in plaintiff’s installations.
On March 5, 1953, plaintiff submitted a detailed tabulation of its facilities and installation costs, in accordance with the final inspection, amounting to $164,755.51, plus $4,815.68 of actual costs of disassembling, crating and shipping the same, which was approved and agreed upon by supplement No. 5, dated April 2, 1953. (See Finding 10(e).) Other disputed items amounting to the net sum of $10,751.03 were finally agreed upon by Supplement No. 5, dated February 21, 1955.
66. Most of the facilities acquired by plaintiff for the account of the defendant were acquired' and installed by the end of March 1952, and were substantially all acquired by *544 the middle of June 1952. The plaintiff claims damages for the delay in acceptance and payment of these facilities in the amount of $8,232.94.
Had inspection and acceptance of all necessary tools and facilities been made promptly, the plaintiff would have been reimbursed for substantially all of its facilities cost by July 15, 1952. The carrying charges thereafter for unpaid balances at the rate of 5 percent per annum to the dates of payment, reported in finding 11 herein, would amount to $8,025.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover on counts one and four of its petition, and it is therefore adjudged and ordered that it recover of and from the United States the sum of ninety-five thousand, eight hundred twenty dollars ($95,820).
It is further concluded that plaintiff is not entitled to recover on counts two and three of its petition, and its petition as to those counts is dismissed.

 In count four of plaintiff’s petition, plaintiff claims the sum of if5,000. However, from referral of the matter for prehearing audit pursuant to Rule 28B3, it was determined that plaintiff’s original claim was insufficient and plaintiff’s claim should properly be increased to $8,232.94, if based on carrying charges alone. It is conceded that the damages based on interest or carrying charges for merely failure to pay money are not recoverable herein, and that the measure of damages should have been determined on the basis of the extra expense plaintiff had to incur, including unnecessary payment of rent for four months after the contract had been completed and prior to inspection, and necessary expenses for plant protection officers and related costs.

 The commissioner has found the amount to be $8,232.94, characterized as “carrying charges.” Plaintiff does not except to this figure inasmuch as it is substantially the amount claimed.

 Part 2 of section XV, Armed Services Procurement Regulations, contract cost principles, provides for allowable direct costs for materials, labor and other direct costs, and allowable indirect costs generally classified as manufacturing and production expenses, selling and distribution expenses and general and administrative expense. It provides in part:
“15-201 General Basis for Determination of Costs. The total cost of a cost-reimbursement type contract is the sum of the allowable direct costs incident to the performance of the contract, plus the properly allowable portion of allowable indirect costs, less applicable income and other credits. The tests used in determining the allow-ability of costs also include (i) reasonableness, (ii) application of generally accepted accounting principles and practices, and (iii) any limitation as to types or amounts of cost items set forth in this Part 2 of Section XV or otherwise included in the contract. * * *”